2021 UT App 82

## THE UTAH COURT OF APPEALS

GRAPHIC PACKAGING INTERNATIONAL INC.
AND AMERICAN ZURICH INSURANCE,
Petitioners,
*v.*
LABOR COMMISSION AND JOSE TORRES,
Respondents.

Opinion
No. 20200210-CA
Filed July 22, 2021

Original Proceeding in this Court

Brad J. Miller and Trent D. Holgate,
Attorneys for Petitioners

Mark J. Sanchez, Attorney for
Respondent Jose Torres

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGES
MICHELE M. CHRISTIANSEN FORSTER and DAVID N. MORTENSEN
concurred.

HARRIS, Judge:

¶1      While working for Graphic Packaging International Inc.
(the Company), Jose Torres injured his back, then reinjured it at
work a couple of years later. After Torres filed a claim for
workers' compensation benefits, an administrative law judge
(the ALJ) appointed a medical panel to assist with conflicting
medical opinions on certain issues, but the panel took a long
time to answer the ALJ's questions and was not able to respond,
to the satisfaction of the ALJ, before its members retired. The ALJ
then appointed a second medical panel, which reached different
conclusions than the first panel. Eventually, the Utah Labor
Commission (the Commission) awarded Torres the temporary
total workers' compensation benefits he sought. The Company

and its insurer seek judicial review of that determination, specifically challenging the ALJ's decision to appoint a second medical panel as well as the sufficiency of the evidence supporting the Commission's determination that Torres reasonably refused the Company's light-duty work offer. We decline to disturb the Commission's award.

BACKGROUND[1]

¶2    Torres worked for the Company for more than fifteen years as a printing press operator, a job that required him not only to operate the printing press machine, but also to prepare materials for printing. During his shifts, which "lasted up to twelve hours," he "had to frequently move printing cylinders, paper, and buckets of ink," as well as "an 80-pound . . . metal part" that he had to lift "three to ten times" a day.

¶3    On September 16, 2011, Torres "was calibrating the machine . . . when he slipped on some hydraulic oil on the floor." He "lost his balance and twisted his body hard" in an attempt to grab the machine and regain his balance, but as he was twisting, he "felt an immediate cold sensation in his low back." In this opinion, we refer to these events as the "2011 Accident."

¶4    Immediately following the 2011 Accident, Torres attempted to work "for about a week," but was unable to "tolerate his duties" and therefore sought medical attention. In October, Torres received a magnetic resonance imaging scan (the 2011 MRI), which indicated "disc bulges with superimposed

---

1. "In reviewing an order from the Commission, we view the facts in the light most favorable to the Commission's findings and recite them accordingly." *JBS USA v. Labor Comm'n*, 2020 UT App 86, n.1, 467 P.3d 905 (quotation simplified).

extrusions at the L4-[L]5 and L5-S1 levels of [his] lumbar spine."[2] Initial reviewing physicians diagnosed Torres with "[m]ultilevel degenerative disc disease," "L4-L5 disc extrusion with left L5 radiculopathy," and "severe impingement" at both the L4-L5 and L5-S1 levels.[3] Torres then visited an occupational health physician in December, who examined Torres, reviewed the 2011 MRI, and afterward confirmed the diagnosis of a

---

2. "The vertebral column, or backbone, is made up of 33 vertebrae that are separated by spongy dis[c]s," and these discs can, over time with age or as the result of injury, "rupture[], or herniate[]." *Lumbar Disk Disease (Herniated Disk)*, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/lumbar-disc-disease-herniated-disc [https://perma.cc/3ZVR-87V5]. "Most dis[c] herniations happen in the lower lumbar spine, especially between the . . . L4-[L]5 and L5-S1 levels." *Id.* Disc extrusion is one type of herniation where "the outer part of the spinal disc ruptures, allowing the inner, gelatinous part of the disc to squeeze out" into the spinal column. *See Washington County School Dist. v. Labor Comm'n*, 2013 UT App 205, ¶ 5 n.4, 309 P.3d 299 (quotation simplified).

3. Degenerative disc disease is essentially "arthritis of the spine," where "cartilage in the spine joints . . . wear[s] out" over time from any "combination of factors, such as doing a lot of lifting, . . . or . . . an injury to the spine." *Degenerative Disc Disease*, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/degenerative-disc-disease [https://perma.cc/CQJ8-SADA]. "[R]adiculopathy is a disease process marked by nerve compression," or "impingement," caused by (among other things) pressure from herniated disc fluid, which leads to pain, numbness, and other symptoms. Jason David Eubanks, *Cervical Radiculopathy: Nonoperative Management of Neck Pain and Radicular Symptoms*, 81 Am. Family Physician 33, 33–34 (2010).

"[h]erniated L4-[L]5 disc" and related radiculopathy, as well as "multilevel degenerative dis[c] disease at virtually every level." Based on that diagnosis, the physician referred Torres to a surgeon (Surgeon), who in turn recommended surgery; Torres then "underwent discectomy surgery and a lumbar fusion at L5-S1 in April 2012."[4]

¶5      In October 2012, after recovering from surgery, Torres returned to full-time work at the Company. He was given "permanent work restrictions" barring him from bending, lifting more than forty pounds, and climbing stairs more than occasionally. At his follow-up visit with Surgeon in December 2012, Surgeon characterized Torres's recovery as being "at maximum medical improvement for work related activities," but ordered that he "undergo an impairment rating to determine permanent restrictions." Torres underwent an impairment assessment in February 2013, and was given a 13% whole person impairment rating based "entirely" on the 2011 Accident.

¶6      Torres continued full-time work for a time under these restrictions, but in July or August 2013, during one of his regular shifts, Torres "miscalculated the height of a step," and as he stepped down he suddenly developed back pain and "felt like his leg was giving out." In this opinion, we refer to these events as the "2013 Accident."

---

4. During a discectomy, "an orthopedic surgeon takes out part of the damaged disc" in order to alleviate pressure caused by disc herniation on nerves that are attached to the spinal cord. *Minimally Invasive Lumbar Discectomy*, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/minimally-invasive-lumbar-discectomy [https://perma.cc/RMK8-E2U9].

¶7    Over the ensuing weeks, the pain in his lower back worsened and he continually felt "pain radiating down his left leg," prompting him to visit the emergency room and schedule an appointment with Surgeon. In the emergency room, Torres rated his pain at "8/10," and he described to Surgeon how it impacted his ability to sit and made it so he could "hardly walk." By the time he visited Surgeon on August 16, Torres had stopped working due to the pain. Surgeon reviewed Torres's X-rays and noted "[n]o significant changes," opining that he was "having an acute episode of back pain" that was "likely due to a disc abnormality." Surgeon initially determined that Torres would be "[u]nable to return to work" until at least August 28. But later, after a follow-up visit on September 10, Surgeon released Torres to return to work at "modified duty," meaning that he could work only four hours a day and lift no more than ten pounds.

¶8    Torres was given another MRI scan on November 15, 2013 (the 2013 MRI), which revealed a "grade 1 disc extrusion at the L4-[L]5 level producing mild to moderate stenosis,"[5] as well as "neurologic impingement." At two follow-up visits after the 2013 MRI, Surgeon noted that he had attempted to get Torres back to work by allowing modified duty work restrictions, but the Company had been "unable to accommodate any restrictions." Surgeon at first attempted to treat the 2013 Accident with physical therapy, but by December 2013 he opined that therapy was not effectively treating Torres's symptoms, and recommended that Torres undergo another

---

5. "Spinal stenosis is a narrowing of the spaces within your spine, which can put pressure on the nerves that travel through the spine." *Spinal Stenosis*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/symptoms-causes/syc-20352961 [https://perma.cc/UKX8-GXK3]. Herniated discs are one of the common causes of stenosis. *Id.*

discectomy (but not another fusion) at the L4-L5 level. Surgeon also recommended that Torres "give strong consideration to vocational retraining," in light of the fact that his job at the Company required "significant lifting and bending." Surgeon concluded that Torres's injuries were potentially permanent, and that Torres would be "[u]nable to return to work before . . . [s]urgical [i]ntervention."

¶9      Meanwhile, on November 5, 2013, Torres filed a claim for benefits with the Commission relating to the 2011 Accident. In his claim he sought compensation for his medical expenses, temporary total disability benefits, permanent total disability benefits, and unpaid interest. A few months later, in February 2014, a physician hired by the Company (Company Expert) examined Torres and reviewed his medical records. After completing his review, Company Expert opined that the 2013 Accident had been a "flareup" of the low back condition caused by the "industrial" 2011 Accident and that, "[a]bsent any evidence to the contrary," Torres's increased pain could "reasonably" be considered to have been caused by the demands of his job. While Company Expert "deferred" an ultimate decision on Torres's work capacity until a later date, he concluded that Torres was able to return to work, but that he should be restricted to lifting twenty pounds on a regular basis and thirty-five pounds occasionally. Later, in a follow-up report, Company Expert concluded that the 2013 Accident had caused only a "temporary exacerbation" of the "low back condition" caused by the 2011 Accident. He further concluded that, because Torres had "return[ed] to baseline level of impairment," he had become medically stable, did not need additional surgery, and was "able to return to work" under the same restrictions discussed in the earlier report.

¶10     Based on Company Expert's initial review, in March 2014 the Company sent an official job offer letter to Torres, in which it claimed to be able to "accommodate" the work restrictions

identified by Company Expert. The job described in the letter would have been a "temporary position" with "shifts of up to 12 hours per day," but would have met Company Expert's restrictions of lifting no more than twenty pounds regularly and thirty-five pounds occasionally. Torres did not accept the offer, telling a Company representative that Surgeon had ordered restrictions that would not allow him to work, at least not under those conditions, until he underwent another surgery.

¶11  At an evidentiary hearing before the ALJ in July 2014, Torres withdrew his claim for permanent total disability benefits, but continued to press his other claims. The Company resisted Torres's claims on several grounds, asserting that the 2011 Accident had been compensable when it occurred but that it was not the medical cause of Torres's then-current symptoms, and that Torres had been offered a light-duty work opportunity but refused to take it. In September, the ALJ issued a written ruling making certain interim findings of fact and conclusions of law, describing the events as set forth above, but the ALJ did not make a final decision on the merits. Instead, he referred the case to a medical panel (the First Panel) because he perceived that there were "conflicting medical opinions" about whether the 2013 Accident was a "temporary or permanent aggravation of [Torres's] permanent low back injury" from the 2011 Accident, "what treatment [was] necessary, and whether or not [Torres was] medically stable." The first question the ALJ posed to the First Panel was whether the 2013 aggravation of Torres's low back condition—which aggravation all medical professionals agreed was an exacerbation (or "flareup") of the injury caused by the unquestionably industrial 2011 Accident—was temporary or permanent. This question assumed that the flareup was related to the 2011 Accident, because there were no "conflicting medical opinions" on that point. Accordingly, the ALJ did not ask the First Panel to opine on whether the 2013 Accident was related to the 2011 Accident.

¶12 The First Panel was appointed in January 2015, but took seventeen months to issue its report—finally offering its first set of opinions in June 2016—and only then after two follow-up inquiries from the ALJ as to the status of the pending report. In its initial report, the First Panel opined that Torres's then-current low back condition was neither a temporary nor a permanent aggravation of the injuries sustained in the 2011 Accident but, instead, was "an unrelated low back injury caused by" the 2013 Accident. Torres filed a timely objection to the First Panel's report, asserting that the First Panel had, "without explanation," "omit[ted] or ignore[d] key pieces of medical information."

¶13 A few weeks after briefing was complete on Torres's objection, the ALJ asked the First Panel for further clarification about "[w]hat effect, if any" it thought the 2011 Accident had on the supposedly new injury that arose out of the 2013 Accident. Seven months later, in April 2017, after receiving no response from the First Panel, the ALJ asked the panel's chair for an update on the status of the follow-up inquiry. Over a month later, the First Panel finally issued its follow-up report, therein reiterating its view that Torres's current symptoms stemmed from "a new low back injury at the L4-L5 level *not influenced* by [the 2011 Accident] at the L5-S1 level." (Emphasis in original.) It explained that its reasoning was based on the assumption that Torres's L5-S1 injury, in its view, had "reached full stability with maximum medical improvement" by October 2012 following several months of recovery after surgery. By this explanation, the First Panel appears to have assumed that the 2011 Accident involved only the L5-S1 level, and not the L4-L5 level; however, as noted above, all other medical professionals had previously agreed that the 2011 Accident involved both vertebral levels.

¶14 Torres timely objected to the First Panel's follow-up report, requesting that the ALJ make his own findings "due to

the length of time" it took for the First Panel to complete its initial and follow-up reports. "In the alternative," Torres asked that "a new panel be assigned to review the medical aspects of [his] case in its entirety." In December 2017, after full briefing on the objection, the ALJ appointed a chair for a new medical panel (the Second Panel) and directed him to appoint the other members of the panel. In a subsequent ruling, the ALJ stated that "[i]t became necessary to utilize a new panel because the previous panel members had retired and were no longer available to provide clarification or answer the [ALJ's] questions." But at the time he appointed the new panel, the ALJ did not mention that the members of the First Panel had retired, stating instead that he was appointing a new panel "[b]ecause the [First Panel had] opined that there was a new injury that occurred in 2013, and no other physician had such an opinion." The ALJ posed several questions to the Second Panel: whether Torres's then-current low back injury was a permanent or temporary aggravation of injuries arising out of the 2011 Accident; the exact date when the injuries from the 2011 Accident had stabilized; the necessary medical care to treat Torres's condition in the future; and, if it determined that the 2013 Accident caused a "new injury," the effect that the 2011 Accident had on said new injury.

¶15    The Second Panel issued its report about six weeks later, and opined that Torres's then-present lower back condition was "a permanent aggravation of his low back problems caused by the [2011 Accident]," reasoning that it had been seven years since the 2011 Accident and that Torres's symptoms had "continue[d] more or less unremitting[ly]." It also found that the aggravation occurring from the 2013 Accident had stabilized by September 2013. And on the fourth question, it indicated its disagreement with the First Panel and opined that the injury occurring from the 2013 Accident was "relatively mild and likely represented only an aggravation of the initial injury" from the 2011 Accident.

¶16    Both parties objected to the Second Panel's report, and in response the ALJ directed three follow-up questions to the panel: whether Torres, at the time the Company offered him the light-duty position, "would . . . have been able to work in a full-time position, standing up to 12 hours per day," lifting twenty pounds regularly and thirty-five pounds occasionally; whether Torres's condition could be expected to improve; and whether consultation with a neuroradiologist (which consultation the ALJ directed the Second Panel to undertake) would change any of the Second Panel's previous answers. The Second Panel submitted a follow-up report a few weeks later, and indicated that it had, at the ALJ's direction, consulted with a neuroradiologist. The Second Panel found that asking Torres to work full-time "is reasonable with accommodations," including limiting his regular shifts to eight hours, limiting any lifting to no more than thirty-five pounds, and allowing him to "alternate positions frequently" so that he would not be required to either stand or sit for prolonged periods. It also reiterated that Torres's "L4-L5 disc disease ha[d] been present and at least partially responsible for [his] symptoms since the [2011 Accident]."

¶17    The Company timely objected to the Second Panel's follow-up report, requesting that the ALJ instead "admit and rely" on the First Panel's reports. After considering the Second Panel's input and both parties' briefing in connection with the Company's objection, the ALJ issued his final order in the case. In addressing the Company's objection to the Second Panel's conclusions, the ALJ noted that, due to retirement, the members of the First Panel had been "unavailable to provide clarification" about its "prior answers" to the ALJ's questions, and in that respect the First Panel's report was "incomplete." He also noted that the Second Panel, but not the First Panel, had enjoyed the "benefit of" having consulted with "a lumbar MRI specialist." Finally, the ALJ found that the medical evidence supported the Second Panel's findings because a "careful review" of both the 2011 and 2013 MRIs showed that the "L4-L5 disc herniation was

present before the 2013 [Accident]." The ALJ also agreed with the Second Panel that Torres "could have worked a light-duty job," but that Torres's "refusal to perform light duty work was not improper" because the position the Company offered would have involved Torres regularly working twelve-hour shifts, and would have only been a "temporary" position. Accordingly, the ALJ awarded Torres temporary total disability compensation dating back to March 2014.[6]

¶18 The Company petitioned the Commission for review of the ALJ's decision, asserting that the ALJ had "continued to needlessly refer the claim back for . . . new medical panels . . . until a favorable medical panel result for [Torres] was finally received." It also took issue with the ALJ's findings on the light-duty work opportunity. The Commission found these arguments unpersuasive, and affirmed the ALJ's order. As to the medical panels, the Commission found that the First Panel's reasoning was "incomplete" and did not sufficiently address the injuries to the L4-L5 level of Torres's spine, which were apparent from the MRIs and physical exams "well before the 2013 [Accident]." And the Commission found the Second Panel's conclusions to be fully "supported by the evidence in the record" and "the product of impartial, collegial, and expert review of . . . Torres's relevant medical history." As to the light-duty assignment, the Commission agreed that the Company had not "made suitable light-duty work available" because, although the light-duty offer complied with the lifting restrictions given by Company Expert, the job would have involved regular twelve-hour shifts, which the Commission concluded made it reasonable for Torres to reject the offer. Accordingly, the Commission affirmed the award of temporary total disability benefits to Torres.

---

6. Prior to the initial July 2014 hearing, both parties stipulated that "temporary total disability compensation ha[d] been paid from August 13, 2013 through March 24, 2014."

ISSUES AND STANDARDS OF REVIEW

¶19 The Company now seeks judicial review of the Commission's decision, and identifies two issues for our consideration. First, the Company argues that it was improper for the ALJ to appoint the Second Panel and, relatedly, that the Commission erred by affirming the ALJ's decision to appoint the Second Panel. The parties present diverging views on the appropriate standard of review to be applied in this situation. Torres contends that the Commission's decision to affirm the ALJ's appointment of a second medical panel presents a mixed question of law and fact that "is highly fact intensive and should be entitled to a high degree of deference." The Company, on the other hand, asserts that we should review this decision non-deferentially as a mixed question that is more law-like than fact-like, contending that the facts underlying the appointment of the medical panels were not in dispute, and that the decision to appoint the Second Panel was driven by the legal effect of the undisputed facts and by interpretation of the relevant statute.

¶20 In our view, neither side has it exactly right, and both appear to conflate *deference* with *discretion*. *See Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 33, 308 P.3d 461 (recognizing that "'discretion' and 'deference' are distinct concepts" in appellate review of an administrative tribunal's decision). Whereas deference is accorded to a tribunal's decision on certain mixed questions that are more fact-like than law-like, and "reflects the idea that we, as an appellate court, are not always in the best position to say what that 'right' answer is," discretion must be "explicitly delegated" to the agency by the legislature, and "involves a question with a range of 'acceptable' answers" from which the tribunal may choose. *See id.* ¶¶ 27–30, 33, 36–39.

¶21 We generally review the Commission's decisions regarding appointment of medical panels for abuse of discretion, based on instructive language in the relevant statute. *See, e.g.*,

*Foye v. Labor Comm'n*, 2018 UT App 124, ¶ 20, 428 P.3d 26 (noting that the governing statute "provides that an administrative law judge generally has discretion to appoint a medical panel"); *Ernest Health, Inc. v. Labor Comm'n*, 2016 UT App 48, ¶ 10, 369 P.3d 462 ("The decision to refer medical aspects of a disability compensation case to a medical panel is generally a matter of discretion."). The governing statute provides that the Commission "*may* refer the medical aspects" of any case involving a claim for "disability by accident" "to a medical panel appointed by an [ALJ]." *See* Utah Code Ann. § 34A-2-601(1)(a) (LexisNexis 2019) (emphasis added). The statute's use of the word "may" is significant, and suggests that the legislature has granted the Commission discretionary power over the appointment of medical panels. *See Mota v. Mota*, 2016 UT App 201, ¶ 6, 382 P.3d 1080 ("[A] statute's use of the word 'may' indicates a [lower tribunal's] discretionary power, the exercise of which we review for an abuse of discretion."). Thus, in light of the discretion afforded the Commission by statute, we review the Commission's decisions regarding appointment of medical panels for abuse of discretion. *See* Utah Code Ann. § 63G-4-403(4)(h)(i) (LexisNexis 2019) (providing that, where "discretion" has been "delegated to the agency by statute," an appellate court "shall grant relief only if . . . the agency action is . . . an abuse of [that] discretion"); *see also Murray*, 2013 UT 38, ¶ 23 (stating that, where the agency is afforded discretion under statute, "we properly review the action for an 'abuse of discretion,' as required by the plain language of section 63G-4-403(4)(h)(i)"). "[A] discretionary decision involves a question with a range of 'acceptable' answers, some better than others, and the agency . . . is free to choose from among this range without regard to what an appellate court thinks is the 'best' answer." *Murray*, 2013 UT 38, ¶ 30. When applying this standard, "we will reverse only if there is no reasonable basis for the decision." *See Johnston v. Labor Comm'n*, 2013 UT App 179, ¶ 15, 307 P.3d 615 (quotation simplified).

¶22   Second, the Company challenges the Commission's finding that Torres "reasonably refused" an offer for light-duty work. Both parties agree that this was "a determination of fact," which we will not disturb so long as it is "supported by substantial evidence when viewed in light of the whole record." Utah Code Ann. § 63G-4-403(4)(g); *accord Provo City v. Utah Labor Comm'n*, 2015 UT 32, ¶ 8, 345 P.3d 1242. "A decision is supported by substantial evidence if there is a quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *Provo City*, 2015 UT 32, ¶ 8 (quotation simplified). "In conducting a substantial evidence review, we do not reweigh the evidence and independently choose which inferences we find to be the most reasonable." *Id.* (quotation simplified). "Instead, we defer to an administrative agency's findings because when reasonably conflicting views arise, it is the agency's province to draw inferences and resolve these conflicts." *Id.* (quotation simplified).[7]

---

7. The Company also contends that it has presented a third issue for our review, asserting that the Commission erred by awarding Torres benefits for injuries from the 2013 Accident even though Torres never filed an application for a hearing arising out of that incident. But the Commission did not award Torres benefits for any injuries arising out of the 2013 Accident alone, except insofar as they were related to the 2011 Accident; rather, the Commission found that the injuries Torres sustained following the 2013 Accident were caused by the 2011 Accident, and the Company—other than taking issue with the appointment of the Second Panel—does not directly challenge this finding. At one point in its brief, the Company does argue that the Second Panel's conclusions are "logically unsound and cannot be relied upon as evidence," but it stops short of fully developing this argument, or even citing the "substantial evidence" standard we apply to such findings. *See* Utah Code Ann. § 63G-4-403(4)(g)

(continued…)

ANALYSIS

I

¶23    First, the Company challenges, on several grounds, the Commission's decision affirming the ALJ's appointment of the Second Panel. We find the Company's arguments unpersuasive, and discern no abuse of discretion in the appointment of the Second Panel.

¶24    The Company first argues that the governing statute "does not authorize" the appointment of a new medical panel after one has already been appointed, and that "the ALJ erroneously interpreted the plain language" of the statute in concluding otherwise. (Quotation simplified.) As noted above, the statute at issue states that the Commission "may refer the medical aspects of a case" involving "disability by accident" to "a medical panel appointed by an [ALJ]." Utah Code Ann. § 34A-2-601(1)(a).    We    acknowledge    the    statute's    use    of

---

(…continued)

(LexisNexis 2019). We therefore consider any "substantial evidence" challenge to the substance of the Commission's ultimate determination to be inadequately briefed, *see State v. Davie*, 2011 UT App 380, ¶ 16, 264 P.3d 770 ("Briefs must contain reasoned analysis based upon relevant legal authority. An issue is inadequately briefed when the overall analysis of the issue is so lacking as to shift the burden of research and argument to the reviewing court." (quotation simplified)), and likely unpersuasive in any event, *see Benson v. Utah Labor Comm'n*, 2018 UT App 228, ¶ 8, 437 P.3d 1253 (per curiam) ("A medical panel's report alone may provide substantial evidence to support the Labor Commission's determination of medical causation."). Accordingly, we need not further discuss this putative third issue.

the indefinite article in referring to "*a* medical panel." *See id.* (emphasis added). But this article does not necessarily connote a restriction limiting the Commission to appointment of only one medical panel. The indefinite article "a" can mean "any," or can be "used as a function word before a mass noun to denote a particular type or instance." *A*, Merriam-Webster, https://www.merriam-webster.com/dictionary/a [https://perma.cc/J2NL-P8SW]; *see also* Utah Code Ann. § 68-3-12(1)(b) (LexisNexis 2019) (stating that, regarding "the construction of a statute in the Utah Code," "[t]he singular includes the plural, and the plural includes the singular"). We do not read the statute as restrictively as the Company does, and we do not discern in its text a command that forbids appointment of more than one medical panel in a given case. To the contrary, the best reading of the statute, and the one that harmonizes the entire subsection, is the one giving the Commission discretion regarding medical panel appointments, including the discretion to decline to appoint one, as well as the discretion to appoint more than one panel if necessary. *See* Utah Code Ann. § 34A-2-601(1)(a) (stating that the Commission "*may* refer the medical aspects of a case . . . to a medical panel" (emphasis added)).[8]

---

8. The Commission's discretion, as set forth in this statute, may be constrained by administrative rule, which requires the Commission to appoint a medical panel in certain circumstances. *See Brown & Root Indus. Service v. Industrial Comm'n*, 947 P.2d 671, 677 (Utah 1997) (stating that "the Commission has discretion to refer a case to a medical panel," but noting that this "discretion is limited by its own administrative rule," which "requires the ALJ to submit the case to a medical panel" in certain situations, including cases where there are "conflicting medical reports"). In this case, neither party contends that this administrative rule, now codified as rule R602-2-2(A) of the Utah Administrative Code, affects the outcome of this case, and both parties agree

(continued…)

¶25 Second, the Company argues that appointing "multiple panels [to] review the same case confuses the purpose of the medical panel," correctly pointing out that the Commission is the final decisionmaker and that medical panels are designed only "to assist" the ALJ and the Commission "in deciding whether medical cause has been proven." (Quoting *Price River Coal Co. v. Industrial Comm'n*, 731 P.2d 1079, 1084 (Utah 1986).) In essence, the Company asserts that the ALJ and the Commission treated the medical panel as a decisionmaker, rather than as an advisory body, and appointed a new panel merely because the ALJ did not like the First Panel's conclusions. We disagree with the Company's interpretation of events. We see nothing in the record indicating that the ALJ or the Commission viewed either medical panel as a final decisionmaker, or that the ALJ or the Commission misunderstood the role medical panels play in proceedings before the Commission. To the contrary, the record includes ample indication that the ALJ correctly understood the advisory role of the medical panels; indeed, the ALJ asked both panels to weigh in on medical issues upon which the other experts' conclusions conflicted, and asked the First Panel clarifying questions about the conclusions set forth in its initial report. In the end, we do not agree with the Company's argument that the ALJ misperceived the scope of the medical panel's assignment.

¶26 Third, the Company contends that, where an ALJ is unpersuaded by the medical panel's conclusions, the ALJ should just make contrary findings rather than appointing a new panel. That course of action is certainly an option for ALJs who are unpersuaded by the conclusions reached by a medical panel. *See*

---

(…continued)

that this case did involve conflicting medical opinions (at least on certain issues) and therefore should have been referred to at least one medical panel.

*Ramos v. Cobblestone Centre*, 2020 UT 55, ¶ 31, 472 P.3d 910 (stating that ALJs "retain[] the discretion to reject the medical panel's recommendation"). But an ALJ may also determine, within its discretion in appropriate cases, to appoint a second medical panel, *see supra* ¶ 24, and in our view this was one of those cases. Here, the ALJ did not appoint the Second Panel merely because the First Panel's "opinion differ[ed] from those in the record," as the Company alleges. To the contrary, the ALJ had good reason to have been frustrated with the First Panel: it took an unreasonably long amount of time to do its work, it appeared to not understand that the 2011 Accident had affected Torres at L4-L5 as well as at L5-S1, and when it finally submitted its report it ended up answering at least one question (whether the 2013 Accident was related to the 2011 Accident) that was not posed and on which there had previously been no conflict in the medical opinions. *See* Utah Admin. Code R602-2-2(A)(1) (setting forth guidelines indicating that medical panels should be utilized "where one or more significant medical issues" are involved in the case, including situations where there exist "[c]onflicting medical opinions related to causation of the injury").

¶27 Moreover, although the ALJ made no mention of the First Panel members' apparent retirements in his memorandum appointing the Second Panel, in his final order the ALJ noted that "[i]t became necessary to utilize a new panel because the previous panel members had retired and were no longer available to provide clarification or answer [the ALJ's] questions." The Company has not disputed the ALJ's representation that the members of the First Panel had retired from medical practice and were unavailable to answer further questions or provide clarification, either in writing or at a subsequent hearing. These facts, if true, could also serve as sufficient justification for appointment of a new panel. *See* Utah Code Ann. § 34A-2-601(2)(f)(ii)–(iii) (allowing a party to request that the medical panel chair appear at a hearing "for

examination and cross-examination," and allowing the ALJ to order that other panel members be present at said hearing "[f]or good cause shown").

¶28    In sum, we see no abuse of discretion in the appointment of the Second Panel, and reject all of the Company's arguments to the contrary. We therefore decline to disturb the Commission's decision affirming the appointment of the Second Panel.

II

¶29    The Company next challenges, as unsupported by substantial evidence, the Commission's determination that Torres reasonably refused a light-duty work offer. We reject this challenge, because there exists sufficient evidence in the record to support the Commission's finding.

¶30    Utah workers' compensation law provides that, "[i]f a light duty medical release is obtained before the employee reaches a fixed state of recovery and no light duty employment is available to the employee from the employer, temporary disability benefits shall continue to be paid." Utah Code Ann. § 34A-2-410(2) (LexisNexis 2019). But if a worker is cleared for light-duty work and the employer makes such a position available, that worker may not "choose[] for some personal reason not to work" and still maintain eligibility for temporary workers' compensation benefits. *See Stampin' Up, Inc. v. Labor Comm'n*, 2011 UT App 147, ¶¶ 9–10, 256 P.3d 250.

¶31    The Company correctly points out that, in early 2014, Company Expert had cleared Torres for light-duty work as long as Torres was restricted to lifting twenty pounds on a regular basis and thirty-five pounds occasionally, and that in March 2014 the Company offered Torres a temporary light-duty position that accommodated the lifting restrictions identified by Company Expert. The light-duty position offered, however,

would have involved "shift[s] of up to 12 hours per day." And the experts' recommendations were not unanimous: as noted above, Surgeon had initially released Torres to return to work in September 2013 at "modified duty," meaning that he could work only four hours a day and lift no more than ten pounds, but a few months later opined that Torres's injuries were potentially permanent, and that Torres would be "[u]nable to return to work" at least until additional "[s]urgical [i]ntervention" had been attempted.

¶32  Against this backdrop of conflicting medical advice, Torres declined the Company's offer of light-duty work, specifically citing Surgeon's recommendations as the reason. The question posed to the ALJ and the Commission was whether Torres's refusal to accept the Company's light-duty position was reasonable under the circumstances. The ALJ found that it was, but relied in part on the Second Panel's conclusions, issued years after Torres had already refused the Company's light-duty work offer. In 2018, the Second Panel specifically concluded that Torres could return to work as long as accommodations were made, including limiting his shifts to eight hours, limiting any lifting to no more than thirty-five pounds, and allowing him to "alternate positions frequently" so that he would not be required to either stand or sit for prolonged periods. The ALJ noted that the offered position would have required Torres to work twelve-hour shifts, and largely on that basis found that Torres's refusal to accept the light-duty position was "not improper." The Commission affirmed that finding, also expressing concern about the potential twelve-hour shifts and ultimately concluding that Torres "did not unreasonably refuse [the Company's] offer of light-duty work."

¶33  The Company assails the Commission's finding, specifically taking issue with the Commission's and the ALJ's reliance on the Second Panel's report, which had not yet been issued when Torres refused the light-duty work offer. We take

the Company's point, and emphasize that the reasonableness of Torres's decision should be analyzed in light of the information Torres had at his disposal at the time he declined the light-duty work offer. *Cf. Sawyer v. Department of Workforce Services*, 2015 UT 33, ¶¶ 29–30, 345 P.3d 1253 (noting that analysis of whether an employee had "good cause to quit" a job must be undertaken based "on what the claimant in fact knew and reasonably should have known" when making the decision (quotation simplified)).

¶34 But even if we do not consider the Second Panel's conclusions, there remains substantial evidence to support the Commission's finding that Torres's decision was reasonable. In particular, Surgeon's recommendation that Torres not return to work until after an additional surgical procedure had been attempted is, by itself, sufficient evidence to support the Commission's finding. Torres specifically cited this medical advice as the reason why he declined the Company's offer, and following the advice of one's treating physician can certainly be considered reasonable. Furthermore, the Company intended for the offered position to be only temporary, meaning that there would be no guarantee that any light-duty position would be available after Torres underwent a second surgery—something that also factored into the ALJ's decision assessing the reasonableness of Torres's refusal. "Substantial evidence is more than a mere scintilla of evidence though something less than the weight of the evidence, and the substantial evidence test is met when a reasonable mind might accept as adequate the evidence supporting the decision," *see Wright v. Labor Comm'n*, 2021 UT App 43, ¶ 26 (quotation simplified), *petition for cert. filed*, June 16, 2021 (No. 20210419), and a reasonable mind could certainly view these rationales as adequately supporting Torres's refusal.

¶35 Thus, we conclude that the Commission's determination that Torres reasonably refused the Company's light-duty work offer was based on substantial evidence, and on that basis we decline to disturb it. Accordingly, Torres's refusal cannot serve

as grounds for the Company to decline to pay him temporary workers' compensation benefits following the refusal.

CONCLUSION

¶36   The Commission did not abuse its statutorily conferred discretion by referring Torres's case to the Second Panel after the First Panel took an inordinately long time to answer the ALJ's questions and was ultimately not able to respond, to the satisfaction of the ALJ, before its members retired from medical practice. And the Commission's determination that Torres reasonably refused the Company's light-duty work offer was supported by substantial evidence. Accordingly, we decline to disturb the Commission's award of temporary total disability benefits to Torres.

_____