**2022 UT App 52**

# THE UTAH COURT OF APPEALS

HEXCEL CORPORATION,
Petitioner,

*v.*

LABOR COMMISSION AND MICHAEL PICKARD,
Respondents.

Opinion
No. 20200514-CA
Filed April 21, 2022

Original Proceeding in this Court

Matthew M. Durham and Vaughn G. Pedersen,
Attorneys for Petitioner

David J. Holdsworth, Attorney for Respondent
Michael Pickard

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and DAVID N.
MORTENSEN concurred.

HARRIS, Judge:

¶1 Hexcel Corporation (Hexcel) fired Michael Pickard, ostensibly because Pickard was caught napping during work hours. But just a few months earlier, Pickard had injured himself while working, and since then had been trying to get Hexcel to accommodate his injuries; Pickard believed that Hexcel fired him not because of his short nap but because it did not want to deal with his injuries. After an evidentiary hearing, an administrative law judge (the ALJ) sided with Pickard and awarded him damages, concluding that Hexcel fired Pickard out of discriminatory or retaliatory motives and that its stated reasons were pretextual. The Labor Commission (the Commission) affirmed the ALJ's award.

¶2     Hexcel now seeks review of that decision, challenging both the pretext determination as well as the amount of damages awarded. We decline to disturb the Commission's pretext determination, but we conclude that the Commission erred in its calculation of damages and remand the matter to the Commission for recalculation of those damages.

## BACKGROUND[1]

¶3     Hexcel owns a manufacturing facility in West Valley City, Utah. This facility operates 24 hours per day, 365 days per year, and is fenced and guarded and not generally open to the public. Hexcel hired Pickard, a maintenance electrician, in 2012. Pickard's duties required him to perform scheduled (and sometimes emergency) maintenance and repairs on machinery and equipment, and he often used a company truck as needed to drive from place to place within Hexcel's campus. Pickard was often asked to work twelve-hour shifts, sometimes at night, and sometimes for several days in a row. The work was physically taxing, typically requiring Pickard to carry heavy tools, walk moderately long distances, and work hands-on with various machinery. But Pickard generally performed his duties well and had received regular pay increases.

¶4     When it hired Pickard, Hexcel provided him with a copy of the company's policies and procedures, which included the company's Standards of Conduct and Work Rules. As relevant here, the company's policies included a ban on "[s]leeping during work time," a rule the parties refer to as "the Sleeping Rule." Hexcel later explained that the Sleeping Rule was grounded in safety concerns rather than productivity concerns: Hexcel worried

---

1. "In reviewing an order from the Commission, we view the facts in the light most favorable to the Commission's findings and recite them accordingly." *O'Connor v. Labor Comm'n*, 2020 UT App 49, n.1, 463 P.3d 85.

that, if evacuation of the facility became necessary, sleeping employees might not be able to hear the alarms.

¶5 For the first few years of Pickard's employment, however, Hexcel made no serious effort to enforce the Sleeping Rule. That changed in January 2017, when Hexcel—in response to a "disturbing increase in the number" of napping employees—sent a memorandum to its employees stating its intent to start enforcing the Sleeping Rule and clarifying that "any future violation" of the rule "will result in termination."

¶6 After that memorandum was issued, several employees inquired as to whether the company intended to forbid naps during breaks. In response, Pickard's direct supervisor (Manager) stated that employees could nap during their breaks, so long as they did so in the designated breakroom. Other employees were informed that naps during breaks would not be punished even if they occurred outside the breakroom. In the ALJ's view, Hexcel's interpretation of the Sleeping Rule was "evolving," and it did not ever reduce to writing the rule's "evolutions and modifications." In particular, "[n]o supervisor ever addressed . . . the question of whether an employee was permitted to nap while taking a break in a company truck." And even after the January 2017 memorandum, Hexcel's enforcement of the Sleeping Rule was far from uniform, and "some employees continued to nap at their desks without consequence."

¶7 In June 2017, Pickard was working a twelve-hour night shift—6:00 p.m. to 6:00 a.m.—along with a coworker (Coworker) with whom Pickard was friendly. During a twelve-hour shift, Hexcel employees were entitled to take one hour's worth of breaks, usually a fifteen-minute break sometime near the three-hour mark, a half-hour lunch break near the halfway point, and another fifteen-minute break around the nine-hour mark. However, employees were generally allowed the flexibility to adjust the timing of their breaks as needed to meet the workload.

¶8      Sometime after 5:00 a.m., after they had been at work more than eleven hours, Pickard and Coworker drove company trucks back to the shop, where they began and ended their workday and where the breakroom was located. Upon arrival, Pickard exited his truck and entered the shop, assuming that Coworker would follow. But Coworker did not follow, because he fell asleep in his work truck and was discovered in that state by Manager.

¶9      Manager then instigated disciplinary action against Coworker for violating the Sleeping Rule. During the ensuing investigation, Pickard participated as a witness and confirmed both that he was aware of the policy and that the policy was known to "everyone." Pickard was under the impression, however, that employees could nap during their breaks if those naps occurred in the breakroom.

¶10     A few days later, Hexcel terminated Coworker for violating the Sleeping Rule. Coworker, however, had been employed by Hexcel for some twenty years and was a member of the local union, and he asked the union to challenge Hexcel's decision. The union agreed to do so, and later filed a grievance on his behalf. The union "aggressively" pursued the case, indicating during negotiations that, if necessary, it would take the matter to arbitration. Hexcel and the union eventually reached an agreement to settle Coworker's case; the settlement obligated Hexcel to reinstate Coworker pursuant to an arrangement that it referred to as a "Last Chance Corrective Action Agreement." Under this arrangement, Coworker was suspended without pay for several weeks, agreed to random drug testing for one year, would be ineligible for promotion for a period of time, and would be subject to termination for future violation of any of Hexcel's work rules. After his suspension, Coworker was reinstated under those terms, and worked for Hexcel until his retirement in November 2017.

¶11 In mid-June 2017, on the day of Coworker's termination, Pickard was helping Coworker load his tools into his truck prior to Coworker's departure. Coworker's tools were large and heavy, and some of them were contained in six-gallon buckets. While Pickard was carrying a bucket full of large wrenches to Coworker's truck, the tools shifted and tipped the bucket, causing Pickard's back to twist. He felt immediate pain, including a burning sensation down his back. He sought medical attention and was unable to return to work for nine days. During the time that Pickard was off work, Hexcel instructed him to use vacation time, pending medical evaluation of his injury. Under Hexcel's terms of employment, use of vacation time is considered an "incident," and any employee who incurs five incidents is subject to employment sanction, up to and including termination.

¶12 When Pickard returned to work, he informed Hexcel that his physicians had recommended certain work restrictions, including a limitation on standing, walking, and sitting more than "2 hours per shift."[2] Pickard also asked to be reassigned to an eight-hour day shift to better accommodate these restrictions; that request was denied, apparently because Hexcel claimed to be "short-handed" at the time. Manager informed Pickard that, if he

---

2. It is unclear, from the record, exactly what the physicians intended by these restrictions. Hexcel interpreted the restrictions narrowly, taking the position that Pickard could accommodate them on his own by "taking a break after any two-hour period of walking, sitting, or standing." Pickard took a different view, and believed that his doctors were counseling him not to walk, stand, or sit for more than two hours in any given shift, recommendations he believed would be easier to achieve in an eight-hour shift than in a twelve-hour shift. In this case, however, we do not need to reach any conclusive determination about the meaning of these restrictions; the point here is that Pickard sought certain accommodations in light of these restrictions that Hexcel was unwilling or unable to provide.

could not work the scheduled shifts, he would have to use his vacation time. Pickard did not want to run the risk of generating additional "incidents," and therefore "returned to his regular schedule" of twelve-hour shifts, which alternated between night shifts and day shifts.

¶13 Pickard continued to receive medical treatment, including administration of prescribed pain and anti-inflammatory medication. After a few weeks, by early August, his condition had been upgraded to allow up to "3 hours per 8-hour shift" of sitting, standing, and walking. Pickard provided ongoing notice of his progressing condition to Hexcel.

¶14 At some point after he returned to work, Pickard attended a daytime training meeting. During that meeting, several employees dozed off and began to snore audibly. Pickard caught Manager's eye and directed his attention to the employees who appeared to be asleep. In response, Manager stopped the meeting, turned on the lights, and instructed everybody to stand up and stretch. After the meeting, Pickard spoke with Manager and expressed his view that, in light of what happened to Coworker, fairness required that these employees be terminated. But no employees were disciplined, let alone terminated, as a result of this event. Pickard also witnessed several other Hexcel employees sleeping during their shifts, and these employees were likewise not disciplined.

¶15 On August 21, 2017, Pickard was assigned to work his fourth straight night shift. His workload was heavy that night and he had been unable to take any breaks, even for lunch, until after 5:00 a.m. At approximately 5:15 a.m., Pickard parked his truck outside the shop—just feet away from the actual breakroom—and set an alarm for 5:45 a.m., so that he would have time to finish his daily paperwork before his shift ended. He then fell asleep in his truck. At 5:22 a.m., after napping for some seven minutes, he was discovered by Manager.

¶16    Manager later initiated disciplinary procedures against Pickard, and the incident was referred to Hexcel's human resources department for investigation. As part of the investigation, Pickard was interviewed, and he explained that he understood the Sleeping Rule to have been modified by the decision to reinstate Coworker. He additionally alleged that he had been told by other employees that a work truck could be considered an extension of the breakroom. Pickard offered his view that the rule was confusing and unclear, and he referenced the training meeting where multiple employees had fallen asleep but were not disciplined.

¶17    About a week later, Hexcel terminated Pickard for violating the Sleeping Rule. The ALJ later found that Hexcel's human resources department left it to Manager to make the final decision regarding Pickard, and he elected termination.

¶18    Pickard then contacted the union to see if it would represent him in grieving his termination, but the union declined because Pickard was not a member. A few weeks after that, in September 2017, Pickard filed a complaint with the Utah Antidiscrimination and Labor Division (the UALD), claiming that he was terminated due to his disabling injury—his lower back condition—and that he had been subjected to unlawful retaliation. Following an investigation, however, the UALD determined that Pickard had not established a prima facie case of either discrimination or retaliation. Pickard was subsequently out of work until December 2017, when he obtained another job working in electrical maintenance.

¶19    Later, Pickard sought review before the Commission. The ALJ held an evidentiary hearing in which Pickard, Coworker, Manager, and a representative from Hexcel's human resources department all testified. Pickard offered testimony—but no documentary evidence—regarding his damages, indicating that, between August and December 2017, he had found it necessary to

withdraw funds from his savings and 401(k) accounts to pay living expenses and medical costs.

¶20    At the conclusion of the hearing, the ALJ ruled in Pickard's favor. She determined that Pickard had made out a prima facie case of discrimination and retaliation, and determined that Hexcel had articulated a legitimate nondiscriminatory reason—violation of the Sleeping Rule—for its actions. However, the ALJ also determined that Pickard had carried his burden of demonstrating that Hexcel's articulated reason for terminating him was mere pretext, emphasizing that Hexcel's explanation for and enforcement of the Sleeping Rule was "incoherent and inconsistent," and concluding that Hexcel's "proffered reason for terminating" Pickard was "unworthy of credence." The ALJ also awarded Pickard damages, ordering Hexcel to pay $30,805.26 in "lost wages," any "out-of-pocket" medical expenses Pickard incurred between August and December 2017, "reimbursement of" Pickard's withdrawals from his savings and 401(k) accounts, and "costs and attorney fees."

¶21    Hexcel then appealed the ALJ's determination to the Commission, challenging both the ALJ's pretext determination as well as its damages award. The Commission largely rejected Hexcel's arguments. In particular, the Commission adopted the ALJ's findings of fact and affirmed the ALJ's pretext determination. With regard to damages, the Commission reduced the amount of the lost wages award to $22,964.05, but otherwise affirmed the ALJ's damages award.

ISSUES AND STANDARDS OF REVIEW

¶22    Hexcel now seeks judicial review of the Commission's decision, and asks us to consider two issues. First, it challenges the Commission's determination that its proffered reason for firing Pickard was pretextual. We have previously determined that a pretext determination made by the Commission is more

"fact-like" than "law-like," and is therefore "entitled to deference by this court" and will not be disturbed unless "clearly erroneous." *See Kunej v. Labor Comm'n*, 2013 UT App 172, ¶ 5, 306 P.3d 855 (quotation simplified). In *Kunej*, we explained that "the determination whether an employer's conduct was motivated by discrimination—i.e., that its proffered explanation was pretextual—is both sensitive and difficult," and requires the Commission to "decide which party's explanation of the employer's motivation it believes." *Id.* (quotation simplified). In this context, the Commission's determination is often "affected by its observation of a competing witness's appearance and demeanor on matters that cannot be adequately reflected in the record available to appellate courts." *Id.* (quotation simplified). Under this standard of review, we will overturn the Commission's determination "only if it is not supported by substantial evidence." *See Nielsen v. Labor Comm'n*, 2020 UT App 2, ¶ 9, 456 P.3d 1167; *see also id.* (applying the "substantial evidence" standard to a "fact-like" determination). "Substantial evidence is more than a mere scintilla of evidence though something less than the weight of the evidence, and the substantial evidence test is met when a reasonable mind might accept as adequate the evidence supporting the decision." *Graphic Packaging Int'l Inc. v. Labor Comm'n*, 2021 UT App 82, ¶ 34, 495 P.3d 228 (quotation simplified).

¶23 Second, Hexcel takes issue with the Commission's damages award, asserting that the Commission erred in awarding damages "based solely on Pickard's uncorroborated testimony," and that the award permits Pickard a "double recovery" by including both lost wages as well as reimbursement of the withdrawals from his savings and 401(k) accounts. These particular challenges do not implicate the Commission's potential discretion in assessing reasonable damages; rather, they raise an issue of evidentiary competence as well as a question of whether the award includes a partial double recovery. "Whether the Commission applied the correct legal standard in making its

[damages] determination is . . . a question of law, which we review for correctness." *A & B Mech. Contractors v. Labor Comm'n*, 2013 UT App 230, ¶ 15, 311 P.3d 528; *see also In re adoption of Baby B.*, 2012 UT 35, ¶¶ 46–47, 308 P.3d 382 (explaining that some "factual and mixed findings" may contain, by implication, determinations regarding "embedded legal questions," and that we review "embedded legal conclusion[s]" without deference).

ANALYSIS

I

¶24　Hexcel first challenges the Commission's determination that its proffered reason for terminating Pickard was pretextual. We reject this challenge, because we conclude that the Commission's determination was supported by substantial evidence and was therefore not clearly erroneous.

¶25　Pickard's claims are rooted in the Utah Antidiscrimination Act (UADA), which provides, in relevant part, that an employer may not "discharge, demote, or terminate a person, or . . . retaliate against . . . a person otherwise qualified, because of . . . disability." Utah Code Ann. § 34A-5-106(1)(a)(i)(H) (LexisNexis 2019). In order to establish a claim under this section of the UADA, a claimant must satisfy the three-step burden-shifting test first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Viktron/Lika v. Labor Comm'n*, 2001 UT App 394, ¶ 7, 38 P.3d 993. Under this test, the claimant "has the initial burden to establish a prima facie showing of the employer's discrimination." *Sheikh v. Department of Public Safety*, 904 P.2d 1103, 1106 (Utah Ct. App. 1995) (quotation simplified). If the claimant is able to make a prima facie showing, then the burden "shifts to the employer who must articulate a legitimate, nondiscriminatory reason for its suspect conduct." *Id.* If the employer can articulate a legitimate reason for its actions, then the burden "shifts back to the employee who must then show by a preponderance of the evidence that the

employer's articulated reasons were merely a pretext for discrimination." *Id.* But "the ultimate burden of persuasion that the employer discriminated against the employee remains at all times" with the claimant. *Id.* (quotation simplified).

¶26 Applying *McDonnell Douglas* and its three-step test, the ALJ found that Pickard met his burden of establishing a prima facie case that Hexcel had discriminated against him based on his disability, and that Hexcel had articulated a legitimate nondiscriminatory reason—Pickard's violation of the Sleeping Rule—for its actions. But the ALJ found Hexcel's proffered explanation to be pretextual, and the Commission affirmed that determination after adopting the ALJ's findings of fact.

¶27 Neither party takes issue with the Commission's determination regarding the first two steps of the *McDonnell Douglas* test: Hexcel does not challenge the Commission's determination that Pickard can make out a prima facie case of discrimination or retaliation, and Pickard does not challenge the Commission's determination that Hexcel has articulated a legitimate nondiscriminatory reason for terminating him. In this case, then, Hexcel's challenge is limited to the third step in the *McDonnell Douglas* test. In particular, it takes issue with the Commission's finding that Hexcel's proffered reason was merely pretextual, and that Hexcel in actuality fired Pickard because he was injured and sought accommodation for that injury.

¶28 In making its determination regarding pretext, the Commission must examine the reasons proffered by the employer for its adverse employment action, and must assess whether the employer "honestly believed those reasons and acted in good faith on those beliefs." *Kunej v. Labor Comm'n*, 2013 UT App 172, ¶ 9, 306 P.3d 855 (quotation simplified). If the employer made a good faith decision for articulable business-related reasons, tribunals should defer to such decisions. *See Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (explaining that courts do not

sit as "super personnel department[s]" and should not "second guess[] employers' honestly held (even if erroneous) business judgments" (quotation simplified)). But if the employer took an adverse employment action for an improper discriminatory or retaliatory reason, and its articulated reason is merely pretextual, the employer has violated Utah law. *See* Utah Code Ann. § 34A-5-106(1)(a)(i)(H).

¶29 Claimants can meet their burden under the third step of the *McDonnell Douglas* test by "demonstrat[ing] that the employer's explanation for its decision was so implausible, incoherent, or internally contradictory that the decision must have been made on some other basis." *Kunej*, 2013 UT App 172, ¶ 6 (quotation simplified); *see also Vaughn v. Epworth Villa*, 537 F.3d 1147, 1153 (10th Cir. 2008) (stating that pretext may be demonstrated by showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-retaliatory reasons" (quotation simplified)). Claimants can make this showing in any number of ways, depending on the facts and circumstances of the particular case; in some instances, claimants have met their burden by presenting "evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff," or that the claimant "was treated differently from other similarly-situated employees who violated work rules of comparable seriousness." *See Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

¶30 In this case, the Commission's determination was based on multiple factors. First, it found that the Sleeping Rule—at least as interpreted and verbally modified by various Hexcel supervisors—was unclear and inconsistent. This finding is supported by substantial evidence in the record. Although the

January 2017 memorandum stated the rule in clear terms—that no sleeping at work would be tolerated—Manager told his employees that they could nap in the breakroom during breaks, and other employees were apparently told that they could nap during breaks even outside the breakroom. And the Commission expressly found that "[n]o supervisor ever addressed specifically the question of whether an employee was permitted to nap while taking a break in a company truck." Indeed, the ALJ concluded that Hexcel "never provided employees with clear and definitive language to specify where and when napping was allowed," and Pickard himself was under the impression that his truck could be considered an extension of the breakroom.

¶31    Second, the Commission found that Hexcel's enforcement of the Sleeping Rule, even after January 2017, was inconsistent. This finding is also supported by substantial evidence in the record. Prior to January 2017, it had become common for employees to nap during their breaks, usually in the breakroom or at their desks, but also sometimes in company trucks. Put simply, the Sleeping Rule, though in place, was not enforced for the first five years of Pickard's employment. But even after the January 2017 memorandum, some employees continued to nap, even outside the breakroom, without consequence. In fact, during the administrative hearing, Pickard referenced several different Hexcel employees—in addition to those who were caught sleeping during the training meeting—who were found sleeping outside of the breakroom, and who suffered no discipline. Coworker confirmed this testimony and likewise testified to witnessing other employees sleep outside of the breakroom without being terminated. The ALJ thus concluded, based on this testimony as well as the incident where several employees fell asleep during a training meeting without disciplinary

ramifications,[3] that she had heard sufficient evidence of "inconsistencies, incoherencies, or contradictions" to discredit Hexcel's proffered explanation for Pickard's termination. *See Vaughn*, 537 F.3d at 1153.

¶32 Hexcel resists the Commission's findings largely by pointing to its treatment of Coworker, and by noting that both Coworker and Pickard committed very similar violations—taking a short nap in their work truck during the twelfth hour of a twelve-hour shift—and were given the same initial sanction: termination. Hexcel correctly points out that Coworker was not injured and seeking accommodation, and that it enforced the Sleeping Rule against him in the same fashion. And Hexcel also asserts that it reinstated Coworker—and not Pickard—only because Coworker, a union member, grieved his termination and the union threatened to take the matter to arbitration. We acknowledge Hexcel's point that an employer may rationally choose to take a different employment action toward a union employee than toward a non-union employee, and agree with Hexcel's argument that—for several reasons—Pickard and Coworker were not necessarily similarly situated. *See, e.g.*, *Lewis v. Frito-Lay, Inc.*, 680 F. App'x 772, 774 (10th Cir. 2017) (concluding

---

3. The ALJ found further inconsistency in the fact that Hexcel reinstated Coworker "but held firm in the decision to terminate [Pickard's] employment." In her view, the "only difference in the two situations [was] that [Pickard] was disabled when he fell asleep, while [Coworker] might not have been working under a similar disability." We disagree with the ALJ's statement that Pickard's injury was the "only difference" between the two situations, *see infra* ¶ 32, but we acknowledge the ALJ's inference that Hexcel's experience with Coworker—which process was essentially completed by the time Pickard fell asleep in his truck— had brought to the company's attention a more lenient alternative course of action that could potentially have been applied in Pickard's situation.

that the plaintiff and two other employees were not similarly situated for purposes of a pretext analysis where the employer offered reinstatement to the other employees, but not to the plaintiff, because "the union threatened or filed arbitration" in the other employees' cases but "not in [the plaintiff's] case"); *Gast v. City of Martins Ferry*, 2019-Ohio-1147, ¶ 51, 129 N.E.3d 507 ("[N]o discriminatory intent may be inferred from a defendant's decision to treat differently union members and non-union members."). We recognize the strength of this evidence, and acknowledge that a different factfinder might have viewed this evidence as strong enough to warrant a determination that Pickard had not carried his burden of showing pretext.

¶33 But there was other evidence, as detailed above, to support the Commission's determination, and we review the Commission's findings deferentially. *See Graphic Packaging Int'l Inc. v. Labor Comm'n*, 2021 UT App 82, ¶ 34, 495 P.3d 228 (stating that if "a reasonable mind might accept as adequate the evidence supporting the decision," then the agency's conclusion has met the substantial evidence test (quotation simplified)). Under the applicable standard of review, the relevant question is not whether we would have made the same decision had we been the factfinders in the first instance. Instead, the relevant question is whether substantial evidence supports the Commission's pretext determination. And on this record, it does. The Commission's determination—while perhaps not the only permissible one under the circumstances—is not clearly erroneous. And on that basis, we decline to disturb it.

II

¶34 Next, Hexcel challenges the Commission's damages award, and lodges two distinct complaints. First, Hexcel asserts that the Commission's award is not supported by sufficient evidence. Second, it asserts that the contours of the award allow

Pickard to enjoy a partial double recovery. We are unpersuaded by Hexcel's first argument, but we find merit in the second.

¶35    Regarding its first argument, Hexcel contends that Pickard provided no documentary evidence in support of his damages claims, and provided only his own testimony in support of those claims. In Hexcel's view, this is not enough. We disagree.

¶36    To establish the fact of damages, "the evidence must give rise to a reasonable probability that the plaintiff suffered damage." *Stevens-Henager College v. Eagle Gate College*, 2011 UT App 37, ¶ 16, 248 P.3d 1025 (quotation simplified). And the plaintiff has the burden to produce "a sufficient evidentiary basis to . . . permit the trier of fact to determine with a reasonable certainty the amount of those damages." *Id.* (quotation simplified). In appropriate cases, a plaintiff can utilize his or her own testimony to help carry this burden. *See, e.g.*, *Fuller v. Mountain Sculpture, Inc.*, 314 P.2d 842, 847 (Utah 1957) (determining that the plaintiff had adequately proven damages by personally testifying that "the stone was worth $30 per ton," especially where "the defendants did not discredit this [testimony] either by cross-examination or contrary evidence").

¶37    Here, Pickard testified about the fact that, because of his termination, he was forced to withdraw various amounts from both his savings account and his 401(k) account to pay living expenses. He also testified about the loss of his health insurance, and subsequent out-of-pocket medical expenses he incurred. Hexcel made no effort, at the evidentiary hearing, to rebut Pickard's testimony about the damages he suffered, nor did it accuse Pickard of violating any obligation to produce damages evidence prior to the hearing. And the ALJ clearly found Pickard's testimony to be credible. In this situation, Pickard submitted sufficient evidence, in the form of his own testimony, to support the Commission's damages determination.

¶38    Second, Hexcel assails part of the damages award as facilitating a double recovery for Pickard. Specifically, Hexcel asserts that Pickard should not have been able to recover *both* his backpay (what the Commission termed "lost wages") *and* the value of the withdrawals from his savings and 401(k) accounts. In Hexcel's view, the withdrawals were intended to replace the wages Pickard lost due to his termination, and an award that gives Pickard both his backpay and reimbursement of the funds he used to replace that lost pay affords him a double recovery. On this point, we agree with Hexcel.

¶39    The UADA provides for awards, in appropriate cases, of back pay and benefits. *See* Utah Code Ann. § 34A-5-107(8) (LexisNexis 2019) (stating that, upon reviewing the evidence at the hearing, the presiding officer shall issue an order requiring "relief to the complaining party, including . . . (i) reinstatement; (ii) back pay and benefits; (iii) attorney fees; and (iv) costs"). But "a party cannot have a double recovery for the same loss." *Brigham City Sand & Gravel v. Mach. Center, Inc.*, 613 P.2d 510, 511 (Utah 1980). As our supreme court once colorfully pointed out, a plaintiff who prevails against a defendant on a claim of wrongful possession of a cow "may not recover both the cow *and* the reasonable value of the cow." *See Helf v. Chevron U.S.A. Inc.*, 2015 UT 81, ¶ 68, 361 P.3d 63.

¶40    By awarding backpay—the amount Pickard lost by not working—*and* reimbursement of his use of savings and 401(k) funds, the Commission essentially allowed Pickard to recover both the metaphorical cow and the reasonable value thereof. Had he never been terminated, he would not have needed to withdraw funds from his savings and 401(k) accounts because he would have used his wages to pay his living expenses. Providing Pickard with a backpay award—plus reimbursement for any tax penalties or interest charges associated with withdrawals from his savings or 401(k) accounts, along with recovery of medical expenses, costs, and attorney fees—is sufficient to make Pickard whole.

Allowing him to recover, on top of all that, the principal amounts withdrawn from his accounts constitutes a double recovery.

¶41 The Commission therefore erred when it awarded Pickard both backpay *and* reimbursement of the principal amounts withdrawn from his accounts. Pickard is entitled to recover only (a) backpay, as amended by the Commission; (b) out-of-pocket medical expenses incurred during his period of unemployment; (c) reimbursement for any tax penalties or interest charges associated with the withdrawals his unemployment required him to make from his accounts; (d) the value of the 401(k) contributions he missed out on during his period of unemployment; and (e) costs and attorney fees. He is not also entitled to reimbursement of the principal amounts withdrawn.

CONCLUSION

¶42 We decline to disturb the Commission's determination that Hexcel's proffered reason for terminating Pickard was pretextual. That determination was supported by substantial evidence and was therefore not clearly erroneous. But we agree with Hexcel that the Commission's damages award was, in one respect, incorrect, and we instruct the Commission to adjust Pickard's damages consistent with this opinion.