2023 UT App 2

# THE UTAH COURT OF APPEALS

VALERIE SWANIGAN, CRYSTAL SWANIGAN, COREY SWANIGAN, CARL SWANIGAN JR., CANDACE SWANIGAN, AND COURTLAND SWANIGAN,
Appellants,
*v.*
AVENUES HEALTHCARE INC. AND ENSIGN GROUP INC.,
Appellees.

Opinion
No. 20210385-CA
Filed January 6, 2023

Third District Court, West Jordan Department
The Honorable Matthew Bates
No. 160904522

Leonard E. McGee and Peter R. Mifflin,
Attorneys for Appellants

Stephen T. Hester and Bradley M. Strassberg,
Attorneys for Appellees

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES RYAN M. HARRIS and RYAN D. TENNEY concurred.

MORTENSEN, Judge:

¶1 Carl Swanigan developed various injuries to his feet while residing in a nursing home. It was determined that he would require amputation to address the condition, but he died of a heart attack before the surgery could be performed. Swanigan's family brought various medical malpractice claims against the nursing home, alleging that the nursing home's breach of duty led to infection that caused clotting, which in turn caused the heart attack. The district court determined that the expert testimony Swanigan's family sought to introduce in this respect was unreliable and, on that basis, excluded that testimony from trial.

The court then determined that, without the excluded testimony, Swanigan's estate could not prove its claim, and therefore it granted summary judgment in favor of the nursing home. Swanigan's estate and heirs now appeal, and we affirm.

BACKGROUND

¶2    Swanigan resided in a long-term healthcare facility operated by Avenues Healthcare Inc. (Avenues) from 2009 through 2013. In early 2013, Swanigan "developed cuts or other injuries . . . to both of his feet." When care providers at Avenues approached Swanigan to treat his wounds, "on numerous occasions, [he] would not allow Avenues to provide him medical care, including refusing to allow Avenues staff to change or inspect the bandage dressing on his feet." Around October 2013, Swanigan developed infections in both feet, which required his transfer to the University of Utah Medical Center for treatment. Physicians at the hospital determined that both of Swanigan's feet would have to be amputated. But just a few days later, before the surgery was performed, Swanigan died from a heart attack.

¶3    Before his death, Swanigan suffered from coronary disease and hypertension, smoked heavily, was obese, and led a sedentary lifestyle. An "[a]utopsy showed an occlusive thrombus[1] in the proximal left anterior descending coronary artery," which the pathologist believed was "likely the acute cause of death."

¶4    After Swanigan's death, Valerie Swanigan, individually and on behalf of Swanigan's estate, and others, individually and

---

1. A thrombus is a "blood clot that adheres to the wall of a blood vessel or organ." *Thrombus*, Taber's Cyclopedic Medical Dictionary 2316 (21st ed. 2009). A thrombus is said to be occluding when it "completely closes the vessel." *Id.*

as heirs (collectively, the Estate), filed several wrongful death and survival action claims against Avenues and Ensign Group, the parent company of Avenues, based on negligence. The Estate designated a medical doctor (Expert) as an expert witness. Expert's testimony largely consisted of the assertion that Swanigan's infection resulted in inflammation, which in turn resulted in coronary problems. However, Expert acknowledged his theory was "not something that's generally promulgated by the medical community."

¶5     As relevant to this appeal, Avenues filed two motions: a motion to strike the testimony of Expert and a motion to dismiss all claims for medical malpractice due to the absence of admissible causation evidence. The district court granted each of these motions.[2]

¶6     In granting Avenues' motion to strike Expert's testimony, the court concluded,

> [T]he testimony of [Expert] fails to meet the requirements for admissible testimony under rules 702(b) or 702(c) of the Utah Rules of Evidence. Per Utah law, this [c]ourt must act as a "gatekeepe[r] to screen out unreliable expert testimony." *State v. Lopez*, 2018 UT 5, ¶ 20, 417 P.3d 116. Under rule 702, expert testimony can be admitted if it is "generally accepted by the relevant expert community," Utah R. Evid. 702(c), or if "the principles or methods underlying . . . the testimony (1) are reliable, (2) are based on sufficient facts or data, and (3) have been reliably applied to the facts." *Lopez*, 2018 UT 5, ¶ 29 (quoting Utah R. Evid. 702(b)).

---

2. The court also granted Ensign Group's motion for dismissal of all claims against it.

> [The Estate] cannot make the requisite threshold showing under Utah R. Evid. 702(b) or (c). There is no dispute that [Expert's] opinion is not based on general acceptance in the relevant expert community. Moreover, [the Estate has] failed to provide any facts to show this testimony is otherwise reliable. [Expert's] theory is largely based on one article published in 2004 in the New England Journal of Medicine . . . that simply shows a correlation between inflammation and heart-related events. [Expert's] theory is otherwise based on his own untested and unproven hypothesis. This is insufficient to allow such testimony to go to a jury and requires this [c]ourt to grant Avenues' Motion to Strike.

¶7　In dismissing the Estate's medical malpractice claims, the court stated that because the testimony of Expert was stricken, the Estate had "no expert testimony to support its claims for medical malpractice or wrongful death." *See Butterfield v. Okubo*, 831 P.2d 97, 102 (Utah 1992) ("To recover for medical malpractice, the plaintiff must produce expert testimony that the medical professional's negligence proximately caused the plaintiff injury."). In a later ruling, the court dismissed the Estate's remaining survival claims because the Estate had "failed to provide any evidence of causation."

¶8　The Estate challenges these rulings on Avenues' motions for summary judgment.

ISSUES AND STANDARDS OF REVIEW

¶9　The first issue is whether the district court erred in granting Avenues' motion to strike the testimony of Expert. "We review the district court's decision to admit expert testimony under an

abuse-of-discretion standard, and we will not reverse a decision to admit or exclude expert testimony unless the decision exceeds the limits of reasonability." *State v. Wall*, 2020 UT App 36, ¶ 50, 460 P.3d 1058 (cleaned up).

¶10 The second issue is whether the district court erred in granting summary judgment in favor of Avenues with regard to the Estate's claims for medical malpractice and wrongful death. "We review a trial court's legal conclusions and ultimate grant or denial of summary judgment for correctness, viewing the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Heartwood Home Health & Hospice LLC v. Huber*, 2020 UT App 13, ¶ 11, 459 P.3d 1060 (cleaned up).[3]

---

3. At trial, the Estate asserted that Swanigan was incompetent to make his own medical decisions, including his decision to decline care for his injured feet. This assertion was largely based on a determination—made two years before Swanigan's residency in Avenues—that he had been incompetent to stand trial in a criminal proceeding. In opposition to this purported incompetency, Avenues filed a motion for partial summary judgment. The district court granted the motion, concluding that the Estate had failed "to provide any evidence that could create an issue of fact as to whether the presumption of competency has been overcome." The court determined that "[n]o evidence was presented that could prove incompetence to make medical decisions at any relevant time." Because there was "no evidence presented to overcome the legal presumption of competency," the court ruled that Swanigan was competent to make his own medical decisions.

    On appeal, the Estate alleges that the district court erred in granting Avenues' motion. Given our determination that the Estate has failed to produce evidence that Avenues' alleged

(continued…)

ANALYSIS

I. Exclusion of Expert Testimony

¶11 The Estate claims that the district court abused its discretion in excluding Expert's testimony when it "required [Expert's] opinion to be conclusively scientifically proven instead of making a threshold showing of reliability or general acceptance." But as we explain—and contrary to the Estate's

_____

breach of duty to Swanigan resulted in his injuries, it is unnecessary for us to address this issue at length. But we observe that Utah law makes clear that "[a]n adult is presumed to have . . . health care decision making capacity," *see* Utah Code Ann. § 75-2a-104(1)(a) (LexisNexis Supp. 2022), and this presumption remains in place until there is a "judicial determination after proof by clear and convincing evidence that an adult's ability to" "receive and evaluate information"; "make and communicate decisions"; or "provide for necessities such as food, shelter, clothing, health care, or safety" "is impaired to the extent that the individual lacks the ability . . . to meet the essential requirements for financial protection or physical health, safety, or self-care," *see id.* § 75-1-201(22). Moreover, the presumption of competence requires healthcare providers to abide by a patient's directives. *See Cruzan v. Director, Mo. Dep't of Health*, 497 U.S. 261, 278 (1990) ("[A] competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment . . . ."); *see also* Utah Admin. Code R432-150-12(3)(c) ("The facility shall ensure that each resident admitted to the facility . . . be informed . . . of . . . the right to refuse treatment . . . .").

Here, no order from a court—or even the documentation of Swanigan's alleged incompetency from the criminal proceeding—was presented to Avenues. And in the absence of any indication of incompetence, Avenues was obligated to respect Swanigan's "constitutionally protected liberty interest in refusing unwanted medical treatment." *See Cruzan*, 497 U.S. at 278.

assertion on appeal—the district court did not exclude Expert's testimony on the grounds that it lacked "scientific certainty" but because Expert's "opinion [was] not based on general acceptance in the relevant expert community" and because the Estate "failed to provide any facts to show this testimony is otherwise reliable."

¶12    Rule 702 of the Utah Rules of Evidence permits "a witness who is qualified as an expert by knowledge, skill, experience, training, or education" to "testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Utah R. Evid. 702(a). However, such expert testimony is admissible "only if there is a threshold showing that the principles or methods that are underlying in the testimony (1) are reliable, (2) are based upon sufficient facts or data, and (3) have been reliably applied to the facts." *Id.* R. 702(b). This "threshold showing" is considered to have been made "if the underlying principles or methods, including the sufficiency of facts or data and the manner of their application to the facts of the case, are generally accepted by the relevant expert community." *Id.* R. 702(c).

¶13    District court judges act as "gatekeepers to screen out unreliable expert testimony," a role that "requires our judges to view proposed expert testimony with rational skepticism." *See State v. Lopez*, 2018 UT 5, ¶ 20, 417 P.3d 116 (cleaned up). Thus, "before admitting [expert] testimony, the judge must determine that the proponent has made a threshold showing of reliability," either by demonstrating that the "principles underlying the expert's testimony are reliable, based upon sufficient facts or data, and have been reliably applied to the facts" of the case or by showing that the underlying principles or methods are "generally accepted by the relevant expert community." *See Taylor v. University of Utah*, 2019 UT App 14, ¶¶ 13–14, 438 P.3d 975 (cleaned up), *aff'd*, 2020 UT 21, 466 P.3d 124.

¶14 The gist of Expert's testimony was that the infection in Swanigan's feet caused the heart attack that led to his death:

> Yeah. I believe that his infection—and he had quite a severe infection of both legs—made him more likely to develop clots, and he developed clots both in his leg as a function of a deep vein thrombosis, as well as in his coronary arteries, which I believe was the proximal cause of his death. So I believe that the infections that he had contributed to—ultimately to his cause of death.
>
> . . . .
>
> So I believe that he would not have suffered a myocardial infarction on that specific day had it not been that he was also suffering from a serious infection at the same time. I believe that the infection triggered the heart attack.

¶15 Expert explained that his opinions were based on the principle "that infection causes inflammation, and inflammation causes heart disease." Expert noted that while "there's certainly a fairly large [amount of] literature" showing that "inflammation is directly associated with atherosclerotic[4] events," "there's less literature on whether or not infection itself is related to thrombotic events." Despite the dearth of literature, Expert asserted,

---

4. "Atherosclerosis is the buildup of fats, cholesterol and other substances in and on the artery walls. This buildup is called plaque. The plaque can cause arteries to narrow, blocking blood flow. The plaque can also burst, leading to a blood clot." *Arteriosclerosis/atherosclerosis*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/arteriosclerosis-atherosclerosis/symptoms-causes/syc-20350569 [https://perma.cc/9JM5-BZMJ].

> But my own personal belief, just simply, is that everybody, I think, would agree that infection causes inflammation. We know that. I mean, that's one of the causes of inflammation in general, is having an active infection. And if you have inflammation, now, again, there is going to be at least some relationship with a coronary disease and thrombosis.

Though he held the belief that infection had a causal relationship with coronary disease, he nevertheless conceded that the notion that "having an infection might increase [a person's] risk of a heart attack" is "not something that's generally promulgated by the medical community." But to support his theory, Expert pointed to a 2004 article in the New England Journal of Medicine, which concluded that "acute lower respiratory tract infections and urinary tract infections are associated with a transient increase in the risk of a vascular event." *See* Liam Smeeth et al., *Risk of Myocardial Infarction and Stroke After Acute Infection or Vaccination*, 351 New Eng. J. Med. 2611, 2615–16 (2004).

¶16   Here, the district court determined that Expert's opinion failed to reach the reliability threshold of either being based on sufficient facts or data or being generally accepted by the relevant expert community. *See supra* ¶ 6. We find no abuse of discretion in this determination.

¶17   First, by his own admission, Expert's theory about the causal relationship between infection and cardiac events was untested. When questioned whether the journal article he had cited in support of his theory "establish[ed] a causal relationship between infection and the development of coronary thrombosis," Expert replied that studies like the one in the article "usually look for associations and not exactly cause and effect." Expert clarified that to establish causation, "You need randomized trials."

¶18 To be clear, Expert's theory that infection causes inflammation, which causes blood clots, which can lead to thrombotic events, was based on logical reasoning and made intuitive sense (at least to him). But this was not enough to make it admissible. For admissibility, there must be sufficient facts and data to back up the conclusion. "[L]ogical deduction may be a reliable method when supported by sufficient facts or data," but it is not enough on its own. *See Taylor*, 2019 UT App 14, ¶ 16. In other words, even though Expert's reasoning may be logically sound, without "sufficient facts or data" to support his premises, the court did not abuse its discretion in determining that his opinion was inadmissible. *See id.*

¶19 Second, Expert's opinion was not based on general acceptance in the relevant expert community. Expert conceded that the theory that "having an infection might increase [a person's] risk of a heart attack" is "not something that's generally promulgated by the medical community." Even the article cited by Expert was limited to a consideration of respiratory and urinary tract infections. *See* Liam Smeeth et al., *Risk of Myocardial Infarction and Stroke After Acute Infection or Vaccination*, 351 New Eng. J. Med. 2611, 2612 (2004).

¶20 Because Expert's opinion was based on a theory that had not been tested and was not generally accepted by the medical community and because it otherwise lacked reliability, we conclude that the district court did not abuse its discretion in striking his opinion under rule 702.

II. Dismissal of Wrongful Death and Medical Malpractice Claims

¶21 Even without Expert's testimony, the Estate argues that it "had expert testimony from other designated experts to provide the jury with foundation to conclude that it was 'poor care' that caused . . . Swanigan's injury." This additional expert testimony, the Estate asserts, supported the causation element of its medical

malpractice claim. Thus, the Estate alleges that the district court erred in granting Avenues' motion for summary judgment with regard to the Estate's claims for medical malpractice and wrongful death.

¶22 The Estate argues that the court erred in discounting the testimony of a nursing home administrator and a physician who had attended Swanigan at the University of Utah Medical Center. In advancing this position, the Estate largely ignores the reason that the court discounted the testimony of these two witnesses with regard to the Estate's medical malpractice claims: neither testified as to causation. And not having expert causation testimony of Swanigan's injuries—from Expert or from the other two experts—is fatal to the Estate's claims.

¶23 The court noted that the nursing home administrator, who was designated by the Estate as an expert witness, testified to the standard of care for nursing homes but his "deposition testimony [fell] far short of establishing actual or proximate cause." This witness opined that even if Avenues had notified Swanigan's doctor that he was refusing care, there was no way of knowing if it would have made a difference for Swanigan's health: "I do not know what [Swanigan's doctor] would have done. . . . But she could have made a decision whether that would be hospitalization, one-on-one care, I.V. antibiotics. We don't know." As the court concluded, this "testimony does not establish that but for the breach the injury would not have occurred." In other words, this expert's testimony did not establish that any of Swanigan's injuries—either his foot injuries or his heart attack and death—would not have occurred if not for the allegedly inadequate care provided by Avenues.

¶24 The court found that the testimony of the university physician—who incidentally was not designated as a causation expert by the Estate—was "similarly unhelpful." She merely stated that the injuries to Swanigan's feet were long-standing and

had developed due to comorbidities, but "[s]he made no effort to connect any breach of [Avenues'] duty of care to [Swanigan's] injuries."

¶25 Without expert testimony on causation, the Estate's wrongful death and medical malpractice claims necessarily failed. *See Kent v. Pioneer Valley Hosp.*, 930 P.2d 904, 906 (Utah Ct. App. 1997) ("Because of the complex issues involved in a determination of proximate cause in a medical malpractice case, the plaintiff must provide expert testimony establishing that the health care provider's negligence proximately caused plaintiff's injury."). Here, the Estate has presented no admissible evidence that any particular injury to Swanigan was attributable to a breach of duty on the part of Avenues. Given this lack of evidence as to causation, we find no error in the district court's grant of summary judgment in favor of Avenues as to the Estate's medical malpractice and wrongful death claims. *See Ruiz v. Killebrew*, 2020 UT 6, ¶ 11, 459 P.3d 1005 ("To ensure that the jury is not left to speculate, plaintiffs may not provide just any evidence of proximate cause: They must generally produce expert testimony that the medical professional's negligence proximately caused the plaintiff injury." (cleaned up)).

CONCLUSION

¶26 The district court did not abuse its discretion in striking Expert's opinion. Because the Estate has failed to produce acceptable expert testimony of medical causation, its challenges to the district court's grant of the summary judgment necessarily fail. Affirmed.

_____