**2023 UT App 108**

# THE UTAH COURT OF APPEALS

BASF CORPORATION AND INDEMNITY INSURANCE COMPANY,
Petitioners,
*v.*
LABOR COMMISSION AND BRADLEY WEST,
Respondents.

Opinion
No. 20220037-CA
Filed September 21, 2023

Original Proceeding in this Court

Brad J. Miller, Attorney for Petitioners

Richard R. Burke, Attorney for
Respondent Bradley West

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER
and DAVID N. MORTENSEN concurred.

ORME, Judge:

¶1 Bradley West was employed by BASF Corporation for over thirty years, during which time he was exposed to chemicals and particulates common in the automotive refinishing business. He was also injured in a warehouse accident in 2015. Following the accident, West continued to work but experienced significant respiratory symptoms that have often been debilitating and, in any event, life-altering.

¶2 West filed claims for workers' compensation benefits, which were contested by both BASF Corporation and its insurer, Indemnity Insurance Company (collectively, Employer, unless the context suggests the reference is solely to BASF Corporation). The administrative law judge (ALJ) appointed a medical panel to review West's extensive medical records and to assist in clarifying conflicting medical opinions regarding the causation of West's

maladies. When the ALJ returned a decision in West's favor, Employer requested that the Labor Commission Appeals Board (the Commission) review the ALJ's decision. The Commission then sent the case back to the ALJ, requesting that a second medical panel be appointed to provide further clarification on the issue of medical causation. After receiving the second medical panel's opinion, the ALJ again found in favor of West, and again the Commission was asked to review the ALJ's determination.

¶3 Following the Commission's favorable decision for West, Employer now seeks judicial review of that determination. We decline to disturb the Commission's order.

BACKGROUND[1]

*Industrial Accident and Exposure*

¶4 Employer is in the business of manufacturing chemicals that make up automotive finishes and bodywork products used by autobody technicians. West held several different roles during his nearly thirty years of working for Employer, but beginning in 2015, his role changed to one where he was responsible for training autobody technicians on how to do complete autobody repair work. More specifically, West trained technicians how to perform repairs on damaged vehicles and how to utilize Employer's paint system to apply automotive finishes. During his employment, West was exposed to a veritable laundry list of chemicals. Prior to March 2015, West had already "been diagnosed with industrial asthma since 1997 along with a deviated septum, sinus cyst, bronchitis, and allergic rhinitis due to allergens."

---

1. "In reviewing an order from the Commission, we view the facts in the light most favorable to the Commission's findings and recite them accordingly." *JBS USA v. Labor Comm'n*, 2020 UT App 86, n.1, 467 P.3d 905 (quotation simplified).

¶5     On March 12, 2015, West was moving inventory from one of Employer's warehouses to another as part of his normal workplace responsibilities. He reached to a top shelf for a gallon can of an industrial automotive resin called SB01, and in an attempt to obtain a better hold on the can, he tipped it in his direction. But the lid of the can had not been properly secured, and once West tipped it toward himself, the SB01 resin spilled onto his face and down his body. The incident left West with "burning in his eyes, 'plugged sinuses', runny nose, congestion, rashes on his face and arms, and significant coughing." Although most of these symptoms resolved with time, he was left with continued "sinus congestion and a runny nose."

¶6     Following the accident, West continued to train others on the use of Employer's paint system until March 8, 2016. The process involved using several different chemicals that would "gas off," operating sanding tools that produced airborne particulates, and mixing various compounds to produce the autobody paint, which is then sprayed through a paint gun.

¶7     Needless to say, the air surrounding West while he was training others and working was full of chemicals and particulates. So during the times "when he anticipated he would be exposed to chemicals and dust," he wore the appropriate safety apparatus, including an "air supplied hood respirator, a paint suit, nitrile solvent resistant gloves, and safety boots." He would, however, frequently walk through auto shops without the safety apparatus when looking for a painter or manager and, as a result, was exposed to whatever was in the air while doing so. West reported that beginning in October 2015, he had been exposed to an increased amount of aerosol paints and chemicals as part of his changed job duties.

¶8     After the SB01 resin incident, West continued to have a cough and sinus congestion, but he chalked it up to "seasonal allergies." When his symptoms worsened in November 2015, he sought medical treatment, believing that his symptoms were attributable to a cold, but he reported that he had been suffering

from congestion and what he believed were allergies since the summer. About three months later, West reported that he had been experiencing "difficulty breathing, [a] cough, congestion, and a runny nose" as well as "occasional sinus pain [and] clogged ears" during the preceding three months.

*Conflicting Medical Opinions[2]*

¶9 In March 2016, West started coughing while giving a product demonstration in a paint booth. He was wearing his safety equipment at the time, but he experienced two hours of continual coughing, to the point that he lost consciousness twice during the spell.

¶10 Subsequent testing and medical visits led to a diagnosis of "interstitial lung disease[3] of unclear etiology."[4] In April 2016, West underwent a biopsy, which indicated that he was suffering

---

2. We outline the many, and often conflicting, medical opinions and diagnoses in the record because of the important context this provides for the decision to appoint a medical panel in the first place and the subsequent decision to appoint a second medical panel. As will be seen, the cause of West's ailments was far from straightforward.

3. Interstitial pulmonary disease, or "interstitial lung disease," "describes a large group of disorders, most of which cause progressive scarring of lung tissue. The scarring associated with interstitial lung disease eventually affects your ability to breathe and get enough oxygen into your bloodstream." *Interstitial Lung Disease*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/interstitial-lung-disease/symptoms-causes/syc-20353108 [https://perma.cc/DGY5-UJJP].

4. Etiology is "the cause of a disease or abnormal condition." *Etiology*, Merriam-Webster, https://www.merriam-webster.com/dictionary/etiology [https://perma.cc/GVD5-HHRP].

from a condition "most consistent with chronic eosinophilic pneumonia" (EP).[5] West then started prednisone treatment. In May 2016, the same doctor who diagnosed him with interstitial lung disease offered the opinion that West's malady was likely the result of "long term exposure or occupational exposure in the auto industry." In August 2016, the director of the Interstitial Lung Disease Program at the University of Utah opined that West's condition "was caused by 34 years of occupational chemical exposures, with specific notice given to . . . isocyanates."[6]

¶11   In December 2016, another of West's doctors, Dr. Gleich, indicated that it was his belief that "the March 1, 2015 to March 8, 2016 industrial exposure caused more than 50% of" West's EP and "that industrial inhalation of diisocyanate[7] may have caused/worsened [West's] lung disease." During this time, West's

---

5. "Eosinophilic pneumonia is a group of rare infections that affects your lungs. A type of white blood cell builds up in your lungs and blood, causing inflammation and damage." *Eosinophilic Pneumonia*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/23955-eosinophilic-pneumonia [https://perma.cc/YQ2S-NM97].

6. "Isocyanates are compounds . . . , which are components of" among other things, "polyurethane paints." *Isocyanates*, United States Dep't of Labor: Occupational Safety & Health Admin., https://www.osha.gov/isocyanates (last visited Sept. 7, 2023). "Isocyanates are the raw materials that make up all polyurethane products." *Id.* "Health effects of isocyanate exposure include irritation of skin and mucous membranes, chest tightness, and difficult breathing." *Id.* "The main effects of hazardous exposures are occupational asthma and other lung problems, as well as irritation of the eyes, nose, throat, and skin." *Id.*

7. "The most widely used [isocyanate] compounds are diisocyanates[.]" *Isocyanates*, Centers for Disease Control & Prevention, https://www.cdc.gov/niosh/topics/isocyanates/default.html [https://perma.cc/U3ER-SQVD].

health continued to decline,[8] and he applied for workers' compensation benefits for the (1) industrial accident and (2) occupational disease, asserting that both were a result of his occupational exposure between March 2015 and March 2016.

¶12    In May 2017, after conducting a medical examination, one of Employer's medical consultants concurred with the previous diagnoses of "[EP] and interstitial lung disease" but reached a different conclusion regarding the cause of West's condition. The doctor noted that the EP "is idiopathic[9] and the interstitial lung disease is inflammatory, which is not consistent with known causes." That same month, another medical consultant for Employer, Dr. Schwartz, conducted an additional medical evaluation and also concurred with the EP diagnosis but concluded that the chemical exposure was not the "probable cause" of West's condition. Dr. Schwartz further noted that simply because someone developed a condition "after years of work with a number of paint products" does not automatically mean that the condition was caused by exposure to those products.

¶13    In September 2017, Dr. Pearl, an adjunct professor in the University of Utah's Division of Critical Care and Pulmonary

---

8. For example, West underwent a functional capacity evaluation, during which the doctor noted that "any exertion induced coughing, shortness of breath, spitting for removal of sputum, and/or blowing of the nose to clear the airway to continue the task assigned." The doctor also indicated that with any exertion, West's heart rate spiked and his oxygen levels dropped drastically in a short amount of time, which also appeared to have an effect on his "mental capacity and required [West] to 'regroup' to remember the task he had been performing."

9. "Idiopathic" means "arising spontaneously or from an obscure or unknown cause." *Idiopathic*, Merriam-Webster, https://www.merriam-webster.com/dictionary/idiopathic [https://perma.cc/5NBB-HC53].

Medicine, reviewed West's medical records to aid in the disability determination. Dr. Pearl diagnosed West with "work-related asthma due to his occupational exposure" while employed "prior to March 2015." But while agreeing with the EP diagnosis, Dr. Pearl "was unsure of the medical cause," noting West's "diagnosis of [EP] is proven but its relationship to his exposure is not." Dr. Pearl also opined that "[i]t is more likely than not, that Mr. West's March 12, 2015 industrial accident aggravated, accelerated and or permanently worsened his industrially caused asthma."

¶14 In January 2018, Dr. Schwartz authored a supplemental medical evaluation disagreeing with Dr. Pearl's diagnosis of industrial asthma. He explained that there was no evidence to support it, and he did not deviate from his previous conclusion that West's EP had no "established relationship with his exposure to paint, isocyanates, or any other chemicals." By April 2018, Dr. Gleich deemed West "totally disabled" and not expected to return to work.

*First Medical Panel*

¶15 In August 2018, the ALJ referred the case to a medical panel to review West's medical records and to respond to the ALJ's questions regarding causation of his medical condition. Two of the questions for the medical panel requested an opinion about what portion of West's condition was caused by the industrial accident and the occupational exposure. Notably, the chair of the medical panel, Dr. Jarvis, "served on the faculty of National Jewish Center in Denver for several years, which is a tertiary care clinical facility specializing in respiratory disorders," and while there, he "focused exclusively on disease caused by work and environment affecting the respiratory tract." The medical panel's subsequent report opined that West "has chronic bronchitis caused by the March 12, 2015 industrial accident." In addressing the occupational exposure between March 2015 and March 2016, the panel agreed that West has EP "due to exposures at his work, specifically isocyanates," which are "a known immunologic cause

of occupational asthma," and highlighted that many physicians believe that isocyanates can cause conditions related to EP. The medical panel noted that the EP diagnosis is relatively new and that "[m]ost of the cases described to date in the medical literature are of an unknown etiology" but that one medical case report indicates that occupational exposure to isocyanates can result in EP. The medical panel explained that "there is no scientific consensus concerning whether isocyanate exposure causes" EP and, "acknowledging this paucity of information, . . . agree[d] that a reasonable degree of medical probability cannot be achieved given the state of clinical science." Nonetheless, the medical panel found, with our emphasis, "causation in this case to be *strongly possible*."

¶16   In July 2020, the ALJ adopted the medical panel's conclusions and ordered that Employer provide West compensation for past and future medical expenses associated with his condition, as well as total disability compensation. Employer requested that the Commission review the ALJ's order, arguing that the ALJ erred in awarding West compensation because the medical panel did not reach a conclusion of medical probability regarding the causation of West's EP. On review, the Commission explained that the "circumstances of this case leave the [Commission] with the unusual scenario of having to make a determination on medical causation for an uncommon condition that even the medical panel did not fully comprehend."

¶17   The Commission then remanded the case for further consideration, ordering that a second medical panel be appointed and noting that the remand did "not affect [the ALJ's] finding on the medical causal connection between the work accident . . . and Mr. West's chronic bronchitis condition or his claim for benefits on such condition." The Commission further explained that its remand was not due to a lack of experience on the part of the first medical panel; quite the opposite: the Commission concurred that the medical panel had sufficient expertise to provide an opinion on West's medical condition and explained that this was so even

when the medical panel was not able to reach a more definite conclusion of reasonable medical probability.

*Second Medical Panel and the Commission's Order*

¶18    The second medical panel comprised three doctors who, either through research or treatment of patients, collectively had specialized knowledge or experience regarding occupational medicine, including occupational asthma and interstitial lung disease, and in diagnosing and treating pulmonary pathologies. In April 2021, after reviewing the available medical records, the second medical panel issued a report indicating that the case was "complex and difficult because of [the] ambiguity of [West's] presentation and the lack of scientific literature about his specific condition related to his exposure." But the panel noted that West's lung biopsy results "support[ed] inhalation exposure/s as the cause of his disorder." The panel further explained that it reviewed the relevant MSDSs[10] and that per those documents, it was clear that West had been exposed to isocyanates, which "are known to cause pulmonary dysfunction," as well as to "several other chemicals that lack appropriate research to determine chronic toxicity and effects." The panel also explained that West "has low personal risk factors for developing non-industrially related" disease, such as no exposure to animal allergens, no "exotic travel history," no smoking history, and no other "autoimmune disease or family history of pulmonary

---

10. MSDS is an acronym for "Material Safety Data Sheet," which "lists the hazardous ingredients of a product, its physical and chemical characteristics . . . , its effect on human health, the chemicals with which it can adversely react, handling precautions, the types of measures that can be used to control exposure, emergency and first aid procedures, and methods to contain a spill." *Standard Interpretations: The Purpose of Material Safety Data Sheets*, United States Dep't of Labor: Occupational Safety & Health Admin., https://www.osha.gov/laws-regs/standardinterpretations/1995-01-25-0 (last visited Sept. 7, 2023).

dysfunction." The panel finally noted that it believed that West's "occupational disease is largely, if not all, attributable to industrial causes," that the "occupational exposure permanently worsened [West's] chronic sinopulmonary disease," and that West's disease was wholly attributable to his occupational exposure.

¶19    Employer objected to the second medical panel's report, primarily taking issue with the panel's opining on the causation issue even while acknowledging the lack of scientific literature regarding the result of occupational exposure to isocyanates. Employer asserted that because of the lack of literature, the second medical panel "chose to speculate regarding the causation of" West's condition.

¶20    The ALJ subsequently issued an order referencing the second medical panel's findings, concluding that the evidence supported the determination that West's chronic bronchitis was caused by the industrial accident and that his occupational exposure "was the sole cause (100%) of the permanent aggravation" of his EP. The ALJ again ordered Employer to compensate West for the associated medical expenses and to provide West with total disability benefits.[11]

¶21    Employer again requested a review of the ALJ's order, and the Commission affirmed the order. The Commission explained that the second medical "panel's report shows that it considered the evidence presented and arrived at a well-reasoned and evidence-based conclusion regarding the causative factors of Mr. West's condition" and concluded that it was convinced by the second medical panel's opinion regarding causation based on the

---

11. The order also overruled Employer's objections to the second medical panel's report.

panel's "impartial position, collegial review of the evidence, and expertise in treating the type of respiratory condition at issue."[12]

¶22 Employer now seeks judicial review of the Commission's final decision.[13]

## ISSUES AND STANDARDS OF REVIEW

¶23 Employer first contends that the Commission abused its discretion when it remanded West's case back to the ALJ with the request that a second medical panel be appointed. "We generally review the Commission's decisions regarding appointment of medical panels for abuse of discretion." *Sysco Corp. v. Labor Comm'n*, 2021 UT App 126, ¶ 13, 502 P.3d 1237 (quotation simplified). *See* Utah Code Ann. § 63G-4-403(4) (LexisNexis 2019) ("The appellate court shall grant relief only if, on the basis of the agency's record, it determines that a person seeking judicial review has been substantially prejudiced by . . . agency action [that] is . . . an abuse of discretion delegated to the agency by statute."). "A discretionary decision involves a question with a range of acceptable answers, some better than others, and the

---

12. The Commission did set aside a portion of the ALJ's award for reasons unrelated to the issues before us.

13. At one point prior to oral argument, West filed a motion to advance his case on our docket, arguing that Employer had effectively abandoned its request for judicial review because it had not filed a reply brief and requesting that we "advance this appeal to the next procedural stage" "so that [the court] may promptly dispose of [Employer's] appeal." Prior to this opinion, we had not ruled on that motion. Under the Utah Rules of Appellate Procedure, filing a reply brief is optional. *See* Utah R. App. P. 24(b) ("The appellant or petitioner *may* file a reply brief.") (emphasis added). Because Employer was present at oral argument and prepared to proceed, West's request to dispose of Employer's appeal on the theory of abandonment is denied.

agency is free to choose from among this range without regard to what an appellate court thinks is the best answer." *Graphic Packaging Int'l Inc. v. Labor Comm'n*, 2021 UT App 82, ¶ 21, 495 P.3d 228 (quotation simplified). When applying this particular standard of review, "we will reverse only if there is no reasonable basis for the decision." *Id.* (quotation simplified).

¶24   In the alternative, Employer argues that even if the Commission did not abuse its discretion in remanding the case for the appointment of a second medical panel, both the ALJ and the Commission erroneously concluded that the second medical panel's opinions provided the requisite level of reasonable medical probability to reach a decision regarding the medical causation of West's condition. Whether "medical causation exists is a question of fact we review for substantial evidence." *YESCO v. Labor Comm'n*, 2021 UT App 96, ¶ 13, 497 P.3d 839. "In reviewing for substantial evidence, we defer to the agency if there is a quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *Id.* (quotation simplified). And Employer bears the burden here: this court "will not disturb the Commission's factual findings unless the party challenging the findings demonstrates that a finding is not supported by substantial evidence." *Danny's Drywall v. Labor Comm'n*, 2014 UT App 277, ¶ 11, 339 P.3d 624 (quotation simplified).

ANALYSIS

## I. The Remand for a Second Medical Panel

¶25   We first address whether the Commission abused its discretion when it remanded the matter to the ALJ and requested that a second medical panel be appointed to further explain the medical causation behind West's condition. Employer argues that the Commission abused its discretion because it had already concluded that—despite having the required expertise to formulate an opinion about West's condition—the first medical

panel was not able to provide an opinion regarding the reasonable medical probability of West's condition, and yet the Commission opted to send the matter back to be reassessed by a new medical panel. In response, West argues that the Commission did not abuse its discretion by appointing a second medical panel because that is a statutorily conferred option of which the Commission may take advantage in the exercise of its discretion. We are not persuaded by Employer's position and conclude that the Commission was well within its discretion when it remanded the matter for the appointment of a second medical panel.

¶26 From the outset, it is helpful to discuss how an ALJ and the Commission are permitted—and sometimes required—to utilize medical panels. Section 34A-2-601(1)(a) of the Utah Code states that an ALJ *may* appoint a medical panel in a case involving "medical aspects." *See* Utah Code Ann. § 34A-2-601(1)(a) (LexisNexis Supp. 2022). And Utah Administrative Code R602-2-2 specifies that a medical panel *must* be appointed when there are "one or more significant medical issues . . . involved" such as "[c]onflicting medical opinions related to causation of the injury or disease." Utah Admin. Code R602-2-2(a)(i); *see also Graphic Packaging Int'l Inc. v. Labor Comm'n*, 2021 UT App 82, ¶ 24 n.8, 495 P.3d 228 ("The Commission's discretion, as set forth in [Utah Code section 34A-2-601(1)(a)], may be constrained by administrative rule, which requires the Commission to appoint a medical panel in certain circumstances."). Once a medical panel is appointed, its role is to "advise[] an administrative law judge with respect to the administrative law judge's ultimate fact-finding responsibility."[14] Utah Code Ann. § 34A-2-601(1)(e)(ii)(B). An ALJ may then utilize the information and opinions provided by the

---

14. To be sure, there is not a dispute in this case about whether the ALJ abused its discretion in appointing the first medical panel—clearly both sides recognize that there were conflicting medical opinions that warranted having a medical panel, and the ALJ did exactly what was required at that point in the proceeding. Rather, Employer argues that the Commission abused its discretion when it requested that a *second* medical panel be consulted.

medical panel to reach a decision regarding medical causation. *See, e.g.*, *Price River Coal Co. v. Industrial Comm'n*, 731 P.2d 1079, 1084 (Utah 1986) ("[T]he medical panel is only to take the facts as found by the administrative law judge and consider them in light of its medical expertise to assist the administrative law judge in deciding whether medical cause has been proven."). Then, on review of the ALJ's decision, the Commission "has fact-finding authority." *Sysco Corp. v. Labor Comm'n*, 2021 UT App 127, ¶ 12, 502 P.3d 1242 (quotation simplified). Although the Commission may not conduct a trial de novo, *see* Utah Code Ann. § 34A-1-303(b) (LexisNexis 2019), if necessary, the Commission may "base its decision on" "written supplemental evidence" it requests, *id.* § 34A-1-303(4)(c).

¶27 It is also useful to consider *Graphic Packaging International Inc. v. Labor Commission*, 2021 UT App 82, 495 P.3d 228, on which both parties rely to support their respective arguments. In *Graphic*, an ALJ appointed a medical panel to consider the medical condition of an injured worker. *Id.* ¶ 11. The medical panel took almost a year and a half to provide the ALJ with an initial report—only after the ALJ repeatedly asked when the report would be completed—and then took over eight months to respond to follow-up requests from the ALJ. *Id.* ¶¶ 12–13. Additionally, the medical panel "appeared to not understand" the claimant's injuries and provided a response to a question that was never presented by the ALJ on a matter that was not in dispute by other reviewing physicians. *Id.* ¶ 26. The ALJ appointed a second medical panel following the claimant's objection to the first medical panel's report based in part on the length of time it took the first medical panel to respond and "because the previous panel members had retired and were no longer available to provide clarification or answer the ALJ's questions." *Id.* ¶ 14 (quotation simplified). Following the ALJ's decision, the employer petitioned the Commission for review, arguing that the ALJ "continued to needlessly refer the claim back for new medical panels until a favorable medical panel result for [the claimant] was finally received." *Id.* ¶ 18 (quotation simplified). The Commission rejected the employer's argument and affirmed the

ALJ's order, finding that the second medical panel's determinations were "fully 'supported by the evidence in the record' and 'the product of impartial, collegial, and expert review'" of the claimant's medical history. *Id.*

¶28 On petition for judicial review, the employer argued, among other things, that the ALJ erred in appointing a second medical panel and that the Commission erred by affirming the ALJ's decision. *Id.* ¶ 19. More specifically, the employer argued that the "governing statute does not authorize the appointment of a new medical panel after one has already been appointed." *Id.* ¶ 24 (quotation simplified). In response, this court explained that the Commission has the discretion to refer a matter back to a new medical panel. *Id.* ("We do not read the statute as restrictively as the Company does, and we do not discern in its text a command that forbids appointment of more than one medical panel in a given case.") (citing Utah Code Ann. § 34A-2-601(1)(a)). This court concluded that, in the context of the issues encountered with the first medical panel, the Commission "did not abuse its statutorily conferred discretion" by requesting that a second panel review the claimant's case. *See id.* ¶ 36.

¶29 Employer contends that this case is distinguishable from *Graphic*. In that case, the Commission remanded for the appointment of a second medical panel on the ground that the first medical panel lacked the required expertise. But here, the Commission concluded that the first medical panel was qualified but was nonetheless unable to provide an opinion regarding medical causation "within reasonable medical probability." Employer argues that "it is unclear how referring the case to a new medical panel would lead to further clarification" for the Commission. West also cites *Graphic*, arguing that, like the Commission's action there, appointment of a new medical panel was appropriate here because "there was a reasonable basis" behind the Commission's decision, namely to get more clarification on the matter of causation. We agree with this latter reading and application of *Graphic*.

¶30  We do not read *Graphic* as defining the *only* reason for when a second medical panel could ever be appointed but rather as an example of a scenario in which the Commission could well determine that a second medical panel should be appointed. Furthermore, we learn from *Graphic* that what really matters is that the Commission must provide a "reasonable basis" for its decision to use its discretion to appoint a second medical panel. *Id*. ¶ 21 (quotation simplified). *See id.* (explaining that, provided the Commission can articulate a reasonable basis, this court will not reverse the appointment of a medical panel). And that is exactly what happened here. The Commission expressed reticence about coming to a conclusion regarding causation that a medical panel—which the Commission duly noted had sufficient expertise—believed that it could not do to an appropriate level of certainty. In an effort to obtain more clarity, the Commission opted to have another medical panel review the matter, which we cannot say was an inappropriate use of the Commission's statutorily authorized discretion. We of course can contemplate a different situation where, for example, the Commission opted to arbitrarily send the case back requesting a second panel without providing any explanation for its decision or providing an illogical explanation. There, we would likely have other things to say on the matter and would be concerned about the appropriateness of the appointment of a second medical panel. But that is not the case here.

¶31  In sum, we do not view the Commission's course of action in this case as an abuse of its discretion. Having reviewed the case before it, and in light of the key question that the first medical panel left incompletely answered, it was well within the purview of the Commission to request that a second medical panel review the issue and provide further clarification and guidance to the ALJ in ferreting out and confirming the root cause of West's condition.

II. Reliance on the Second Medical Panel's Report

¶32    If we conclude that the Commission did not abuse its discretion in directing that the ALJ appoint a second medical panel—which we do—Employer argues in the alternative that both the ALJ and the Commission erred when they overruled Employer's objections regarding the second medical panel's report. Employer's attack is two-fold: (1) there was not sufficient evidence in the record to support that West's occupational exposure caused his medical condition and (2) the medical panels, while both acknowledging the dearth of medical literature—or, in other words, scientific consensus—on the issue, still inappropriately "speculated" that West's EP was caused by his occupational exposure.

¶33    In response, West explains that the first medical panel was mistaken when it concluded that it could not offer an opinion on "'medical causation' because there was not yet scientific consensus that isocyanates can cause EP." Referencing *State v. Rimmasch*, 775 P.2d 388, 396–99 (Utah 1989), *superseded by rule as stated in State v. Maestas*, 2012 UT 46, 299 P.3d 892, West asserts that the issue of scientific consensus has been addressed by the Utah Supreme Court and that the rule in Utah has long been that "[m]edical opinions on new or 'novel' medical conditions do not require scientific consensus," but rather require only that "medical opinions on novel conditions must be inherently reliable." Therefore, West argues that it was reasonable for the Commission to remand the case to permit a second medical panel to remedy the first panel's error in concluding that, due to a lack of scientific consensus, it could not reach a degree of reasonable medical probability regarding West's condition.

¶34    We first address Employer's argument regarding the notion that scientific consensus on a subject must be established before a medical panel can reach a definitive causation conclusion. We then discuss Employer's argument that to reach a conclusion about medical causation, the record must contain sufficient evidence to support the conclusion.

A.     Scientific Consensus and Rule 702

¶35     There is argument from both sides about the notion of scientific consensus. Employer argues that because there was not sufficient scientific consensus in the medical community that exposure to isocyanates could cause a condition like West's, as evidenced by the lack of medical literature regarding the matter, the medical panel could not offer an opinion to a reasonable degree of medical probability that West's condition was a result of his workplace exposure. In response, West argues that, in fact, the medical panel did not need to find consensus in the scientific community because the standard has long since changed to allow for other avenues of reaching a conclusion regarding the medical probability that his condition was caused by his exposure, such as considering whether an opinion is based on application of specialized knowledge when analyzing and reviewing relevant facts or data pertinent to a case.

¶36     Under rule 702 of the Utah Rules of Evidence, it is true that consensus in the scientific community is *one* way to establish the requisite causation, but it is not the only way. *See* Utah R. Evid. 702(c) ("The threshold showing required by [rule 702(b)] is satisfied if the underlying principles or methods, including the sufficiency of facts or data and the manner of their application to the facts of the case, are generally accepted by the relevant expert community.").[15] But aside from the general-acceptance avenue,

---

15. We cannot let West's position regarding "inherent reliability," *see supra* ¶ 33, to escape comment. West is correct that general scientific consensus is not the only way to reach a sound causation conclusion. But "inherent reliability" is not—nor has it ever been—the standard required under rule 702(b) of the Utah Rules of Evidence. Instead, the "threshold" that is required is "only a basic foundational showing of indicia [of] reliability" for expert "testimony to be admissible." *See State v. Sheehan*, 2012 UT App 62, ¶ 22, 273 P.3d 417 (quoting Utah R. Evid. 702 advisory committee's note).

(continued…)

rule 702(b) provides that an expert can offer an opinion if "there is a threshold showing that the principles or methods that are underlying in the testimony (1) are reliable, (2) are based on sufficient facts or data, and (3) have been reliably applied to the facts." *Id. See also Swanigan v. Avenues Healthcare Inc.*, 2023 UT App 2, ¶ 13, 524 P.3d 173 (explaining that a "proponent has made a threshold showing of reliability" if (a) "the principles underlying the expert's testimony are reliable, based upon sufficient facts or data, and have been reliably applied to the facts of the case" *or* (b) "by showing that the underlying principles or methods are generally accepted by the relevant expert community") (quotation simplified); *State v. Sheehan*, 2012 UT App 62, ¶¶ 20–22, 273 P.3d 417 (establishing that the "threshold showing" "requires *only* a basic foundational showing of indicia [of] reliability for the testimony to be admissible, *not* that the opinion is indisputably correct") (emphases added) (quotation otherwise simplified).

¶37    Here, while we assume, without deciding, that there is no medical consensus about whether isocyanates can be the medical cause of EP, the first panel did—in conjunction with its discussion

---

West also cites *State v. Rimmasch*, 775 P.2d 388 (Utah 1989), *superseded by rule as stated in State v. Maestas*, 2012 UT 46, 299 P.3d 892, in support of his argument against Employer's assertion regarding scientific consensus. *See supra* ¶ 33. We reiterate that the standard as originally promulgated in *Rimmasch*—i.e., requiring in instances of "novel scientific principles or techniques" the imposition of "additional tests of admissibility" to "assure, as a threshold matter, that the evidence is sufficiently reliable," *see Rimmasch*, 775 P.2d at 396—is no longer the standard required under rule 702. *See Sheehan*, 2012 UT App 62, ¶ 20 (explaining that rule 702 as amended in 2007 now allows "for admission of expert testimony upon a threshold showing that the principles or methods on which such knowledge is based are generally accepted by the relevant legal expert community," thereby replacing the "novel vs. non-novel dichotomy that ha[d] served as a central analytical tool in Utah's Rule 702 jurisprudence") (quotation simplified).

of its review of West's medical history—reference a medical study that supported its conclusion. More specifically, the first medical panel explained that "while acknowledging this paucity of information [regarding the causation of EP because of its 'relatively new' status], and agreeing that a reasonable degree of medical probability cannot be achieved given the state of clinical science, [it] none-the-less finds causation in this case to be strongly possible." The second panel, while also noting the lack of literature supporting causation, provided an explanation of its review of the facts and data it had been provided. After reviewing the chemicals West was exposed to and his relevant medical history, which included a consideration of personal risk factors, the second panel reached the conclusion that his condition was wholly attributable to his occupational exposure. And both panels consisted of doctors who were well-versed in the relevant areas of medicine.

¶38 If there was any question whether the first medical panel appropriately relied on the single medical case report to support its causation conclusions, the matter was then solidly put to rest with the second medical panel's report concluding that the requisite causation was supported by its review of the facts in West's case coupled with its expertise in the fields of pulmonary and occupational diseases. Because scientific consensus was not the only basis on which either medical panel could opine on causation, it was not error for the ALJ and the Commission to rely on the second medical panel's report to assist them in reaching their respective determinations.

B.     Sufficiency of Evidence and Medical Causation

¶39 Quoting *Wright v. Labor Commission*, 2021 UT App 43, 489 P.3d 211. Employer contends that to show medical causation, an injured worker must support the assertion that their occupation was the cause of the injury or disability with "evidence, opinion, or otherwise." *See id.* ¶ 29 (quotation simplified). Employer argues that the record must contain sufficient evidence to show that the Commission's causation determination was "based on a

reasonable medical probability rather than on a medical possibility." *See YESCO v. Labor Comm'n*, 2021 UT App 96, ¶ 19, 497 P.3d 839 (quotation simplified). Employer argues that the record establishes that only a medical *possibility*, rather than a *probability*, exists to support the notion that West's exposure to the isocyanate is what caused his condition. We disagree that the record was lacking in information that the ALJ and the Commission could, and did, utilize in reaching their respective conclusions.

¶40    When deciding a matter regarding causation for purposes of compensation, "[i]t is not unusual for an administrative law judge and the Commission to adopt the findings of a medical panel." *Moyes ex rel. Moyes v. State*, 699 P.2d 748, 753 (Utah 1985). "However, it is the prerogative and the duty of the Commission to consider not only the report of the medical panel, but also all of the other evidence and to draw whatever inferences and deductions fairly and reasonably could be derived therefrom." *Blair v. Labor Comm'n*, 2011 UT App 248, ¶ 19, 262 P.3d 456 (quotation simplified), *cert. denied*, 268 P.3d 192 (Utah 2011). For this court to "meaningfully review the findings of the Commission, the findings must be sufficiently detailed and include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each factual issue was reached." *Id.* ¶ 20 (quotation simplified).

¶41    Here, the record is not sparse. The record contains medical notes from the doctors that West visited prior to and following the claim being filed, including conflicting opinions regarding causation; MSDSs with information about the chemicals West was exposed to that the second panel had access to;[16] and information about West's symptoms before and after the industrial accident,

---

16. The second medical panel was provided all the MSDSs, while the first panel noted it did not have the MSDS for the SB01 resin that spilled on West.

as well as during his regular course of work involving training others how to use Employer's painting systems.

¶42 Additionally, both the ALJ and the Commission provided detailed explanations as to why their review of the record with the support of the medical panel reports left them convinced that West's repeated exposure to isocyanates through his regular course of employment was the cause of his condition. The ALJ and the Commission both referenced West's work history and subsequent accident, the symptoms that ensued, the doctor reports from West's visits prior to pursuing workers' compensation benefits, and his working conditions. From their review, they drew clear, reasoned, and supported inferences and provided detailed explanations for their conclusions.

¶43 In sum, Employer has failed to show that the Commission's findings were not supported by substantial evidence. *See Danny's Drywall v. Labor Comm'n*, 2014 UT App 277, ¶ 11, 339 P.3d 624. We therefore decline to disturb the Commission's conclusion that West's occupation was the cause of his medical condition.

### III. Attorney Fees

¶44 Finally, West requests that this court award attorney fees to him under rule 33 of the Utah Rules of Appellate Procedure. West has requested the award based on his claim that Employer's request for judicial review was "frivolous because it was not grounded in fact, not warranted by existing law, and/or a good faith argument to extend that law." He further claims that Employer's petition for judicial review was a "delay" tactic to "needlessly increase [his] litigation costs." Although Employer's arguments were unsuccessful, they were not frivolous, and we therefore decline to award the requested attorney fees. *Cf. Redd v. Hill*, 2013 UT 35, ¶ 28, 304 P.3d 861 (stating that the imposition of attorney fees as a sanction for a frivolous appeal under rule 33 "is a serious matter and only to be used in egregious cases, lest the threat of such sanctions should chill litigants' rights to appeal lower court decisions").

CONCLUSION

¶45 Employer has not persuaded us that the Commission abused its discretion when it remanded the matter with the direction that the ALJ appoint a second medical panel to determine the causation of West's medical condition. Furthermore, Employer has not convinced us that the Commission erred when it concluded, in reliance on the opinion of the second medical panel, that West's medical condition was caused by his industrial accident and occupational exposure to isocyanates. We therefore decline to disturb the Commission's decision.

_____